[No. S042223. Aug. 14, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER JOSEPH COOK III, Defendant and Appellant.

COUNSEL

Peter Giannini, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—A jury convicted Walter Joseph Cook III of three counts of first degree murder for killing Ernest Sadler, Michael Bettencourt, and Ronald Morris (Pen. Code, § 187),[1] and it found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)). It further found that the murder of Sadler was committed with a deadly weapon (§ 12022, subd. (b)), that defendant personally inflicted great bodily injury on Sadler (§ 1203.075), and that defendant personally used a firearm in murdering both Bettencourt and Morris (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) At the penalty phase of trial, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

---

[1] Further statutory references are to the Penal Code, unless otherwise indicated.

## I. FACTS AND PROCEEDINGS

### A. *Prosecution's Guilt Phase Case-in-chief*

The murders of Ernest Sadler, Michael Bettencourt and Ronald Morris occurred on separate occasions and were unrelated to one another, except for each victim's link to defendant, a seller of crack cocaine.

### 1. *Sadler murder*

Around 4:00 o'clock on the morning of February 9, 1992, police officers found the body of Ernest Sadler lying on the pavement in the 2200 block of Menalto Avenue, East Palo Alto. Sadler's head was severely battered and three bloodstained, broken pieces of board were found near his body by officers responding to a 911 call. Because Sadler's distinctive shoe prints were visible on the damp soil in the front yard of the house at 2250 Menalto, San Mateo County Sheriff's Detective William Osborn interviewed the 11 occupants of the residence, none of whom admitted to having seen Sadler killed.

Only months later did several occupants of the house admit that they had known about Sadler's killing. In June, Shawnte Early gave police a recorded statement in which she reported seeing defendant fighting with Sadler and continuing to attack Sadler with a stick after Sadler was on the ground. She described coaxing defendant into her car and driving him around the corner only to have him jump out and run back to resume beating Sadler. At trial, Early repudiated her taped interview, testifying that she did not remember having made the detailed statement and that it was untrue. A tape recording of her June 1992 interview was played for the jury.

Ernest Woodard, who lived at 2250 Menalto, testified that he was awakened that night by "someone" who told him there was a fight outside. He saw defendant, whom he knew by sight, engaged in a fistfight, and told the combatants to move on down the street. Woodard, a convicted felon, feared a police investigation of the fight would bring them to his house. At the time of trial, Woodard was serving a prison term for selling cocaine.

Sometime after the fight, Velisha Sorooshian, a relative of Woodard's by marriage, came to 2250 Menalto with Leonard Holt to buy crack cocaine. While the pair sat in their car smoking a pipe of crack cocaine, a car containing defendant pulled alongside, and he laughingly asked Velisha to go see if the man lying in the street was all right. She assumed defendant was joking until she returned to 2250 Menalto to buy more cocaine and Woodard told her the man was probably dead; Woodard asked her to call 911, which

she did. Holt testified that earlier in the evening, about 8:00 or 9:00 o'clock, he had run into Sadler. When Sadler said he wanted to buy a $5 rock of cocaine, Holt told him to try the Woodard house.

The day after Sadler's death, Shannon Senegal, defendant's cousin, ran into defendant, who reported that he had "beat someone down last night" on Menalto, identifying his victim as Sadler. Defendant explained that Sadler had taken some of defendant's crack and tried to run off with it. When Senegal asked if Sadler had died, defendant said he did not know and expressed no concern over that possibility. (At the time of trial, Senegal was in custody, charged with being an accessory after the fact to the murder of Ronald Morris.)

According to the pathology report, Sadler's death was the result of having aspirated blood into his lungs from extensive injuries to his face and head, including ruptured eyeballs and broken facial bones. These injuries were consistent with a severe beating. Sadler had a blood-alcohol level of 0.09 percent and tested positive for both cocaine and cocaine metabolite. Sadler was 44 at the time of his death.

### 2. *Bettencourt murder*

Between midnight and 1:00 a.m. on February 14, 1992, a group of people was gathered in East Palo Alto on Alberni Street, a site of illegal drug sales. A group of young women, including Shawnte Early, Teresa Beasley, and Tomika Asburry, was in the street drinking to celebrate the birthday of their friend Valerie Gardley. When a gold Thunderbird car stopped in the middle of the street, its driver, Michael Bettencourt, who was apparently trying to buy drugs, was immediately surrounded by potential sellers, including defendant. Steven Sims, one of the sellers, stuck his arm in through the open driver's window but was jostled, causing him to drop his rock of cocaine inside Bettencourt's car. Sims opened the driver's door to look for the fallen rock. Sims then heard defendant, who was holding a nine-millimeter automatic pistol, threaten Bettencourt to return the rock or pay for it. When defendant yelled, "Get back, get back," Sims stepped away and saw defendant shoot Bettencourt once in the leg, then pause and unload the "clip in the nine," shooting Bettencourt repeatedly. Although Asburry identified defendant as the shooter in her statement to the police, at trial she recanted, insisting that she had not seen the shooter, and that her earlier statement was false.

After the shooting, Nathan Gardner testified that defendant jumped into Gardner's car, rode a few blocks, and got out. During the ride, when Gardner asked why he had shot Bettencourt, defendant explained that Bettencourt had tried to "gaffle," meaning to steal from, him. Steven Sims testified that a day

or so after the shooting he encountered defendant on the street and referring to the shooting said, "Dude you tripped out." Defendant replied, "He should have give[n] me my money or my rock back."

Bettencourt was found dead in his car, with the driver's door standing open. No one in the neighborhood contacted by the responding officer had any information to impart about the shooting. That officer saw numerous shell casings in the street next to the open car door; investigators recovered 13 cartridge cases and two bullets from that area. Later forensic examination determined that 11 of the shell casings had come from a single gun.

### 3. *Morris murder*

On the afternoon of May 21, 1992, three women accompanied Sharoon Reed to University Liquors. As the women left the liquor store in their car, they encountered Shannon Senegal, who was driving a tan-topped, burgundy-colored Nova car; Lavert Branner and defendant were passengers. The men in the Nova were in a hurry to pull out of the parking lot, and one of them shouted at the women to "hurry up and move." Defendant displayed a gun to the women, who slowed their car, but followed the Nova at a distance. The women were headed for a birthday party in honor of Ronald Morris. Morris, who knew and was friendly with Senegal, had just parked his car on East O'Keefe Street where the party was to be held when he hailed the Nova, which made a U-turn and pulled next to him.

Senegal testified that while he was talking with Morris, defendant, who was in the front passenger seat, suddenly leaned across Senegal and started shooting Morris, announcing, "I told you I will get your punk ass back." According to Senegal, defendant harbored a grudge against Morris for an incident about a week earlier when an armed Morris had encountered defendant, who was unarmed, and had mocked defendant's vulnerability. Defendant told Senegal he would "get back" at Morris.

Reed testified that, from the women's car, she overheard Morris as he looked into the Nova from the driver's side say, "Damn, you all strapped," indicating that the Nova's occupants were armed. By Reed's account of the shooting, Morris suddenly turned away from the Nova just before she heard multiple shots fired.

Dr. Parviz Pakdaman, a pathologist, testified that Morris had five bullet wounds in his heart and lungs, any one of which was "potentially fatal." The victim's blood tested negative for drugs but showed a 0.04 percent level of alcohol.

### 4. *Murder weapon*

Various nine-millimeter cartridge casings recovered from the pavement where Morris fell were compared to nine-millimeter casings recovered from the Bettencourt murder, but San Mateo County Sheriff's criminalist Nick Stumbaugh could not determine with certainty whether both sets of casings had come from the same weapon, possibly because those from the earlier killing were aluminum while those from the later killing were brass.

Defendant was arrested on a California warrant in Oklahoma on June 26, 1992; he waived extradition, and he was returned to California to stand trial. While still in Oklahoma he gave a lengthy interview to East Palo Alto Police Sergeant Gregory Eatmon and Inspector Bruce Sabin of the San Mateo District Attorney's Office. In that interview, defendant said he "blanked out" and could not remember killing Morris,[2] but he admitted that after an evening of drinking he had used his nine-millimeter handgun to shoot Bettencourt and that on the day after the Morris shooting he had thrown the gun off the Dumbarton Bridge. No gun was ever recovered.

### B. *Defense Case at the Guilt Phase*

Conceding that defendant had shot Bettencourt, the defense focused on the similarity of the witnesses' statements as evidence they had been coached by the police. Teresa Beasley, who had given a statement in June 1992 identifying defendant as the shooter of Bettencourt, testified that her statement had been coerced and reflected what the police wanted her to say.

The defense further sought to establish that Bettencourt's killing was at most second degree murder. Accordingly, it presented expert testimony by Kenneth Mark, a private criminalist; in Mark's opinion, a 170-pound person who consumed two 40-ounce beers and a pint and a half to two pints of alcohol over 10 hours without eating would be at best unsteady on his feet and at worst unconscious. Dr. James Missett, a psychiatrist with expertise in the effects of alcohol and drugs, testified that a person angry when drinking would "interpret things in an angry way."

With respect to the killings of Morris and Sadler, the defense portrayed the police investigation as an effort to frame defendant with those unsolved murders by persuading or pressuring witnesses to inculpate defendant, instead of Shannon Senegal, Lavert Branner, or some unknown party. Seeking to cast

---

[2] At trial, videotapes of defendant's interview were admitted into evidence and played for the jury, which was also provided with a transcript prepared by the prosecution. The trial court cautioned the jury to rely on the words they heard in the tape recording rather than on the text of the transcript.

doubt on defendant's culpability for Morris's death, the defense presented evidence that linked Shannon Senegal and Lavert Branner to the killing. It relied on a May 1992 statement by Tasha Bradford identifying Shannon Senegal, the driver of the Nova, as the man who shot Morris, and identifying his passenger as Walter Wright or Walter White, not defendant Walter Cook. It also presented the testimony of Shannon Senegal's sisters that their brother and defendant were together on the day of Morris's shooting, that Shannon flew to San Diego shortly after the shooting, and that one sister had attempted to mislead both a defense investigator and the police about Shannon's whereabouts.

Monique Barrett and Lakishain Smith testified that on May 9, 1993, Lavert Branner told them he had shot Morris. Barrett had become friendly with defendant, who was her husband's cellmate. Smith first met defendant when he was in jail, and she then began visiting and corresponding with him.

The defense sought to show that Branner also knew murder victim Morris well, having roomed with him at the California Youth Authority. It emphasized that Branner had repeatedly been assured by police that he was not a suspect in the Morris murder. On the eve of trial, Branner conformed his version of events to Senegal's account that it was Senegal, not defendant, in the driver's seat when Morris was shot.

As for the Sadler killing, the defense emphasized that the police long lacked a suspect in that killing, in part because many of the probable witnesses at 2250 Menalto on the night of the killing were Woodard family members, relatives, or associates, who were apparently reluctant to talk lest they implicate other family members in the case.

### C. *Prosecution's Penalty Phase Case*

At the penalty phase the prosecution presented evidence of four occasions when defendant engaged in unadjudicated criminal acts in which he used force or threats.

On February 2, 1990, East Palo Alto Police Officer Terry Brown responded to a man-with-a-gun call at the home of defendant's father, Walter Cook, Jr., and his stepmother, Geraldine Cook. Geraldine reported that defendant, after arguing with her, went into his bedroom and emerged with a MAC-11 assault pistol, which he loaded and pointed at her, threatening "to blow" her "head off." When the police arrived, defendant refused to come out of the house, so Brown and other officers entered and searched, eventually finding defendant hiding in a crawl space under the floor of his bedroom. The pistol was later recovered from the garage.

The second and third incidents took place on January 21, 1991, at a basketball game in Frankfurt, Germany where defendant, while living with his mother and stepfather, attended Frankfurt High School, a school for military dependents. Markus Hallgrimson testified at the penalty phase that he attended Frankfurt High and played on the school basketball team. He was at a drinking fountain in the gymnasium hallway after a game when several Black youths directed racial insults at him. One of the youths, who was wearing a purple sweatshirt and an earring, kneed Markus in the stomach and slammed his head into a locker, giving him a concussion. Markus's mother testified at the penalty phase that about half an hour later, a young man in a purple sweatshirt made his way into the stands and began heckling the Frankfurt High basketball coach, whom he eventually assaulted. Robert Prinz, assistant principal at Frankfurt High School, confronted the youth in the purple sweatshirt who was being verbally abusive to another teacher and who seemed to have been drinking. At the penalty phase of defendant's capital trial, Prinz identified defendant as the youth in the purple sweatshirt.

The fourth incident occurred on January 14, 1992, when defendant was living in East Palo Alto. Officer Phillip Johnson of the East Palo Alto Police Department testified at the penalty phase that after securing a crime scene with yellow caution tape on a block where three persons had been shot, he saw defendant starting to walk through the area. When Johnson confronted him, defendant refused to leave, telling the officer to get out of his way "[b]efore I fuck you up." Defendant, who did not appear to be intoxicated, was arrested for resisting an officer.

### D. *Defense Penalty Phase Case*

Both defendant's mother, Valerie Phillips, and his father, Walter Cook, Jr., testified, and their testimony was corroborated by that of other family members. By their account, they married young, and defendant was born in Louisiana on September 25, 1973. They moved to Texas and from there to California in 1976. Both of them used drugs and alcohol daily, including during Valerie's pregnancy. By the time they came to California, their marriage was shaky, in part because Walter, Jr., conceded he beat Valerie "pretty regular." When Valerie sought a divorce, Walter, Jr., who did not have custody of defendant, came to a family birthday party and took the boy without permission. Fearing for her son's safety after that episode, Valerie took defendant, who was then about seven or eight years old, to Texas to live with his maternal grandmother. The latter testified that during his stay with her in Texas defendant was fearful for his safety, causing her to install a latch on the bedroom door so that he would feel safe at night. Defendant also expressed concerns about his mother's safety, telling his grandmother about an episode when his father threatened to drive himself, the boy, and his mother off the Dumbarton Bridge.

In 1981, defendant's mother married a second time, to Morales Cutts. That marriage lasted until defendant was 12 or 13 years old. After their divorce she married her third husband, Kenneth Phillips, who was in the Army. The couple lived in Seaside, California, and was eventually joined by defendant. In 1989, when Phillips was stationed in Germany, defendant chose to stay in California and live with his father and stepmother in East Palo Alto. After the incident when defendant threatened Geraldine with an assault pistol, he joined his mother and stepfather in Germany, where he stayed for about a year. Defendant lived briefly with his maternal grandmother in Sacramento but he soon returned to his father's residence in East Palo Alto. His father was aware that defendant was selling and using drugs and drinking heavily.

Dr. George Wilkinson, a psychiatrist, spent some 23 and a half hours in interviews with defendant and he reviewed tests of defendant conducted by other mental health professionals. That testing measured defendant's IQ at 90, and revealed that he had severe deficits in mathematics and a learning disability impairing his processing of auditory information. In Wilkinson's view, defendant suffers from dissociative disorder, but otherwise has no diagnosed mental disease. Defendant's dissociative disorder manifests itself in traumatic situations, causing him to experience a slowing of time and to feel that he is losing his mind, which causes him significant physical discomfort. Defendant's dissociative disorder developed as a defense mechanism to traumatic events, including the verbal and physical violence he experienced in childhood, and results in his denying or forgetting moments of great stress. Accordingly, when his life is sufficiently structured, defendant functions adequately, but stress renders him almost psychotic.

Dr. Wilkinson found confirmation of that diagnosis in symptoms defendant exhibited as early as the age of six and a half, when he was examined after complaining of persistent headaches and of stomach pain of a type associated with ulcers. Several witnesses confirmed that defendant had complained of headaches throughout his childhood.

In each of the murders, Wilkinson concluded that defendant was subjected to a situation of considerable violent conflict, verbal and sometimes physical. For instance, the night before Sadler's killing, defendant was at a nightclub at which a fight broke out and defendant was hit with a chair, and so he was especially prone to overrespond when his argument with Sadler escalated. Defendant told Dr. Wilkinson that after killing Sadler he was the victim of a robbery and beating; that event, according to the psychiatrist, heightened defendant's paranoia. Thus, according to Dr. Wilkinson, the melee and shouting that broke out around murder victim Bettencourt's car, coupled with defendant's perception that Bettencourt was reaching for a gun, caused defendant to go into a dissociative state and begin shooting. After the first

two murders, the psychiatrist testified, defendant became "increasingly paranoid and depressed," so that when he encountered Morris, a person who he perceived to have threatened him, defendant shot Morris in retaliation.

## II. PRETRIAL ISSUES

### A. *Motion to Sever*

#### 1. *Ruling on motion*

Before trial, defendant unsuccessfully moved to sever the three murder charges and try them separately. Defendant contends that the trial court abused its discretion when it denied his severance motion, rendering his trial fundamentally unfair, in violation of his right to due process and a fair trial under both the state and federal Constitutions. We disagree.

■ Section 954 permits "[a]n accusatory pleading" to charge "two or more different offenses of the same class of crimes or offenses, under separate counts . . . ." Here, the three murder counts are crimes of the same class and thus come within the provisions of the statute. (*People v. Sapp* (2003) 31 Cal.4th 240, 257 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. Maury* (2003) 30 Cal.4th 342, 392 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Section 954 further provides that the trial court, acting "in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately." We review a trial court's decision not to sever for abuse of discretion based on the record when the motion is heard. (*People v. Stitely* (2005) 35 Cal.4th 514, 531 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Sapp, supra,* 31 Cal.4th at p. 258.) A pretrial ruling denying severance that is not an abuse of discretion can be reversed on appeal only if joinder is so grossly unfair as to deny the defendant due process. (*People v. Valdez* (2004) 32 Cal.4th 73, 120 [8 Cal.Rptr.3d 271, 82 P.3d 296].)

Factors to be considered in assessing the propriety of joinder include: "(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*People v. Mendoza* (2000) 24 Cal.4th 130, 161 [99 Cal.Rptr.2d 485, 6 P.3d 150].) When, as here, crimes of the same class are charged together, "evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together . . . ." (§ 954.1.)

In ruling on the motion, the trial court here considered first whether the Bettencourt and Morris murders could properly be tried together; it concluded that they could, noting that those victims were killed by multiple shots fired from the same gun, which defendant admitted was his. Thus, the trial court found "substantial cross-admissibility" of evidence as to those counts. It further found that neither case was "particularly inflammatory in comparison to the other," and that in each there was substantial evidence of defendant's guilt.

As for the murder of Sadler, the trial court considered the question "much closer." Because Sadler was beaten rather than shot, the court concluded there was no evidentiary cross-admissibility between that killing and the other two, but it noted that there was a common eyewitness, Shawnte Early. On June 11, 1992, Early had given the police a taped statement, identifying defendant as the man who repeatedly shot Bettencourt. She also identified defendant as the man who argued with and then had a fistfight with Sadler, and who continued to beat Sadler with a stick after the latter fell to the ground. Although at trial Early repudiated her earlier statement, she had not done so when the trial court denied defendant's severance motion, and we review the trial court's rulings in light of the facts known to the court when it heard the motion. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Although the trial court found severance was a close question, in that Sadler's killing was a "somewhat weaker" case, it ruled that joinder did not pose a risk that the jury would return a guilty verdict on that count rather than find reasonable doubt as to defendant's guilt. Notwithstanding the brutality of Sadler's beating, the court concluded joinder was unlikely to prejudice defendant in light of the other two multiple gunshot killings. Lastly, referring specifically to section 954.1, the court concluded defendant would not be unduly prejudiced by joinder, and it denied defendant's severance motion.

The trial court did not abuse its discretion in so ruling. Apart from the cross-admissibility of evidence between the Bettencourt, Morris, and Sadler killings, joinder of the three murder counts was proper because they were all murders, and therefore were "offenses of the same class of crimes." (§ 954.1.) Nor was any one murder especially likely to inflame the jury's passions. The three killings were each committed for seemingly trivial reasons and all involved excessive force, as shown by the ferocity of the beating of Sadler and the number of shots fired at Bettencourt and Morris. None of the cases was especially weak. Defendant admitted that he had shot Bettencourt and that, while he could not remember actually shooting Morris, he possessed the gun immediately before and after the shooting until he discarded it the next day. There was strong evidence of defendant's responsibility for Sadler's

death. Two eyewitnesses, Early and Woodard, had given pretrial statements to the police identifying defendant as the man fighting with Sadler. And Velisha Sorooshian's pretrial statement to police recounted defendant driving up after the fistfight and laughingly asking her to go see if the victim was dead. Also, defendant's cousin, Shannon Senegal, had reported to investigators that he heard defendant admit responsibility for the Sadler killing shortly after it occurred. Finally, joinder of only the Bettencourt and Morris murders would have sufficed to support the multiple-murder special circumstance; therefore, the joinder of the Sadler murder did not expand defendant's death penalty liability. Even under a heightened scrutiny for joinder of charges, when the joinder itself gives rise to the only special circumstance allegation—that of multiple murder (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699])—we here conclude that defendant has not shown suffered prejudice from a single trial on all three murder charges.

We also reject defendant's contention that the single trial of the three murders resulted in actual unfairness so great as to deny him due process (*People v. Valdez, supra,* 32 Cal.4th at p. 120; *People v. Mendoza, supra,* 24 Cal.4th at p. 162) and to deprive him of his right to a fair trial under the Fifth Amendment to the federal Constitution. (See *United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8 [88 L.Ed.2d 814, 106 S.Ct. 725].) Here, before trial defendant admitted to investigators that during a dispute over a street sale of crack cocaine he repeatedly shot and killed Bettencourt on February 14, 1995. As to his motive, two witnesses (Steven Sims and Nathan Gardner) testified at trial that defendant said he shot Bettencourt because the victim was trying to steal defendant's cocaine. The first victim, Sadler, had been murdered only some five days earlier when, according to defendant, Sadler tried to run away after taking some of defendant's cocaine. Defendant told police that, shortly before Morris was shot, Morris threatened him, and that, while he could not recall the actual shooting, the "last thing" he remembered was seeing Morris looking inside the car at him as his loaded gun lay on the car seat next to his right leg. A witness to the shooting (Shannon Senegal) testified that defendant suddenly shot Morris point blank, and then said, "I told you I will get your punk ass back." In light of defendant's admissions, the testimony of eyewitnesses identifying defendant as the perpetrator of the killings, and the use of defendant's gun in two of the three killings, a joint trial of all three murders was not fundamentally unfair.

### 2. *Prosecutor's presence at hearing on severance motion*

Defendant contends the trial court erred by not hearing his severance motion in chambers without the prosecution present. He argues that the court's failure to do so prejudiced his ability to advance inconsistent defenses—on the one hand, his defense that his killing of Bettencourt was at

most second degree murder, and on the other hand that there was reasonable doubt as to whether he was the actual killer of either Sadler or Morris— without revealing to the prosecution the work product and possible strategy of the defense. The trial court's failure to hear the motion in chambers, defendant argues, deprived him of his rights to remain silent and to counsel under the Fifth and Sixth Amendments, respectively, to the United States Constitution.

Because defendant mentions no defense request for such a hearing, presumably his point is that the trial court was obliged on its own initiative to hear defendant's severance motion without the prosecution present. He offers no authority for that proposition, instead citing cases where in-chambers review was sought of discovery documents containing private or privileged information. (*State of California ex rel. Dept. of Transportation v. Superior Court* (1985) 37 Cal.3d 847, 855–856 [210 Cal.Rptr. 219, 693 P.2d 804] [accident reports for collision site]; *Kelvin L. v. Superior Court* (1976) 62 Cal.App.3d 823, 829 [133 Cal.Rptr. 325] [juvenile's *Pitchess* request for police officer records].) Absent some evidence the defense requested an in-chambers hearing and articulated the harm defendant might suffer from a hearing at which the prosecution was present, we cannot say that the trial court erred when it did not exclude the prosecution from the hearing on defendant's severance motion.

### B. *Three Strikes*

Defendant argues that the multiple-murder special circumstance should have been dismissed because the three 1992 homicides with which he was charged were subject to the provisions of the three strikes law (§§ 667, 1170.12), adopted in 1994. That law, he contends, provides the exclusive means of punishing a person who is convicted of a felony and who has previously been convicted of certain specified felonies. We have in the past rejected this claim (*People v. Hughes* (2002) 27 Cal.4th 287, 405–406 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Alvarez* (1996) 14 Cal.4th 155, 246–247 [58 Cal.Rptr.2d 385, 926 P.2d 365]), and defendant offers no basis to reconsider that rejection.

### C. *Speedy Trial*

Defendant contends that he was denied his right to a speedy preliminary hearing, in violation of the federal and state Constitutions. The claim is based on these facts: On July 1, 1992, defendant appeared in court without counsel. The next day, appearing again without counsel, he said, "I don't know" when asked if he was willing to waive time, and he sought a continuance to obtain an attorney. On July 9, defendant appeared with counsel and obtained a

continuance until July 16. On July 16, defendant again appeared with counsel, was advised by the court of his right to a speedy preliminary hearing, and personally waived it. On September 29, at the entry of defendant's plea of not guilty, defense counsel acknowledged the earlier waiver, and defendant once again personally waived time for the preliminary hearing.

Defendant's "express personal on-the-record agreement" to the continuances waived his claim as to his rights under the federal and state Constitutions. (*People v. Anderson* (2001) 25 Cal.4th 543, 604, fn. 21; see also *id.* at p. 605, fn. 22 [106 Cal.Rptr.2d 575, 22 P.3d 347].) His contention that the record is incomplete is not dispositive because the record before us is sufficient to resolve his claim, and therefore he has suffered no prejudice. (*People v. Frye* (1998) 18 Cal.4th 894, 941 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

### D. *Defense Motion to Disqualify Trial Judge*

Before trial, defendant moved unsuccessfully to disqualify the trial judge initially assigned to this case, and the motion was heard by a jurist from another county. Defendant made the motion on the basis that the judge had had "a serious dating relationship" with an employee of the district attorney's office. The motion was brought under Code of Civil Procedure section 170.1, subdivision (a)(6)(A)(iii), which authorizes recusal if a "person aware of the facts" might doubt the judge's impartiality. Defendant argues that his motion was erroneously denied, requiring him to exercise his single peremptory challenge (Code Civ. Proc., § 170.6) against the assigned judge, which effectively deprived him of his statutory right to one peremptory challenge, and violated his due process right to an impartial trial judge, a right that defendant argues is protected by a peremptory challenge.

We agree with the Attorney General that defendant has forfeited any complaint about the statutory propriety of the disqualification ruling, because such an order must be challenged within 10 days by a petition for mandate. (Code Civ. Proc., § 170.3, subd. (d); *People v. Mayfield* (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Defendant may, however, raise on appeal his constitutionally based claim of judicial bias. (*People v. Chatman* (2006) 38 Cal.4th 344, 363 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Williams* (1997) 16 Cal.4th 635, 652 & fn. 5 [66 Cal.Rptr.2d 573, 941 P.2d 752].) In any event, we reject defendant's due process claim that he was denied an impartial judge. The challenged judge did not preside over defendant's trial. Nor has defendant raised any claim, here or below, that Judge Browning, who did preside, was biased.

### E. *Inadequate Record*

Defendant complains that because transcripts from several hearings were lost or unavailable he has been denied due process. He notes that the record lacks reporter's transcripts for a pretrial discovery motion made on July 28, 1992, in what was then the municipal court (before the unification of the municipal and superior courts), for a hearing on October 20, 1992, at which his preliminary hearing was continued,[3] and for the issuance of a bench warrant for witness Shawnte Early on May 12, 1993.[4]

▮ All proceedings in a capital case must, under section 190.9, be conducted on the record with a reporter present and transcriptions prepared. (*People v. Frye, supra,* 18 Cal.4th at p. 941.) " '[N]o presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citations].' " (*People v. Wilson* (2005) 36 Cal.4th 309, 325 [30 Cal.Rptr.3d 513, 114 P.3d 758]; see *People v. Hinton* (2006) 37 Cal.4th 839, 919 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

Even if we assume that there were reporter's transcripts for each of the three dates in question, defendant has failed to indicate what the missing record might contain, including what the discovery motion sought. Given the existence in the record before us of other documents and discussions relating to the continuance of the preliminary hearing and to the bench warrant for Early, we reject defendant's claim that the record before us does not permit meaningful review.

### III. GUILT PHASE ISSUES

### A. *Discovery Violations*

On appeal, defendant argues that the trial court erred in denying his motions for sanctions based on the prosecution's belated disclosure of interviews with, and information about, four witnesses that were not given to the defense until after trial had begun. He contends that the failure to timely provide this evidence violated his rights under the federal and state Constitutions.

---

[3] On October 20, 1992, defense counsel filed a written motion to continue the preliminary hearing. That motion was scheduled to be heard on October 22, 1992. It is not clear whether there was any proceeding to be transcribed on October 20, 1992.

[4] Defendant also asserts that the reporter's transcript for July 16, 1992, when he waived a preliminary hearing, is missing. He is wrong. It is included in the clerk's transcript.

In early June 1994, during the prosecution's case-in-chief, the defense filed a motion seeking sanctions against the prosecution for discovery violations, stating that the prosecutor had only then turned over to it tapes and notes of interviews with four witnesses. The trial court heard the motion, and it denied sanctions at that time. A month later, at the conclusion of defendant's case-in-chief, the defense renewed its mistrial motion, incorporating the discovery violation claims it had made in June, and further contending that on July 8 it first learned that witness Thomas Young had been arrested in connection with the murder of Ernest Sadler. The court held an evidentiary hearing outside the jury's presence. It found that the defense had been informed of Young's arrest immediately before he testified. It determined that defendant suffered no prejudice when defense counsel did not question Young about his arrest. It concluded beyond a reasonable doubt that, even if the defense had elicited from Young that he had been arrested in connection with Sadler's murder, defendant would not have achieved a more favorable outcome in light of the substantial evidence that defendant was Sadler's murderer.

■ Under the due process clause of the United States Constitution the prosecution must disclose to the defense any evidence that is "favorable to an accused" and is "material" on either guilt or punishment. (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194].) Failure to do so violates the accused's constitutional right to due process. (*Id.* at pp. 86–87.) "Evidence is material under the *Brady* standard 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' (*United States v. Bagley* (1985) 473 U.S. 667, 682 [105 S.Ct. 3375, 87 L.Ed.2d 481].)" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7–8 [124 Cal.Rptr.2d 202, 52 P.3d 129].) Evidence that is material to defendant's guilt, innocence or punishment and that impeaches a prosecution witness must be disclosed. (*Kyles v. Whitley* (1995) 514 U.S. 419, 432–433 [131 L.Ed.2d 490, 115 S.Ct. 1555]; *United States v. Bagley, supra,* 473 U.S. at p. 676; *People v. Seaton* (2001) 26 Cal.4th 598, 648 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

1. *Thomas Young's arrest and interview by police*

Defense witness Thomas Young was one of the occupants of 2250 Menalto on the night of Sadler's killing. He was arrested on May 11, 1994, on suspicion of being an accessory to the murder of Sadler, was given a polygraph test that cleared him of participating in the Sadler murder, and was released. He then gave an interview to Inspector Bruce Sabin of the San Mateo County District Attorney's Office. Young's arrest, interview, and polygraph test were first disclosed to the defense on June 13, 1994, during the guilt phase of trial.

Defendant complains of the prosecution's belated disclosure of Young's postarrest interview and maintains that the defense did not learn until after the guilt phase verdict was returned that Young had been arrested in connection with Sadler's killing. Defendant's claim that the defense was unaware of Young's arrest is not borne out by the record. The trial court held an evidentiary hearing at which Deputy District Attorney Robert Foiles testified that on June 13, 1994, immediately before the defense called Thomas Young as a witness, Foiles personally told Defense Attorney Edward Pomeroy about Young's arrest. The trial court found that the defense had learned on June 13 of Young's previously undisclosed arrest. Because the interview and the fact of the arrest were disclosed before Young testified, the only prejudice to which defendant can point is defense counsel's inability to suggest in his opening statement that Young, not defendant, was the one who killed Sadler. Defendant was not denied due process under our federal Constitution because there is no reasonable probability (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57 [94 L.Ed.2d 40, 107 S.Ct. 989]) that a defense opening argument citing the arrest of Young, who then passed a polygraph test and was immediately released from custody, would have changed the outcome of the guilt phase, given the evidence of defendant's guilt presented at trial.

In his reply brief, defendant asserts that defense counsel's alleged knowledge of Young's arrest before Young testified cannot be reconciled with defense counsel's failure to question Young about his arrest. Defendant bases this claim on a second ruling by the trial court. Once the trial court made the factual finding that Defense Attorney Pomeroy had been told of Young's arrest, both defense attorneys moved to withdraw before the penalty phase of trial began, arguing that if they had had such knowledge they necessarily had provided ineffective assistance by failing to cross-examine Young about his arrest. The trial court also denied that motion, relying on its earlier finding that defendant suffered no prejudice.

In essence, defendant challenges the factual determination of the trial court that the defense was informed *before* Young testified that he had been arrested as an accessory. We are not persuaded that the only possible explanation for defense counsel's failure to question Young about his arrest was counsel's ignorance of the arrest. Based on the record before us we cannot say that the trial court's factual finding that the defense had been told of Young's arrest before Young testified is unsupported by the evidence. Nor can we say that counsel's decision not to pose questions about the arrest was ineffective assistance rather than a strategic choice.

### 2. *Velisha Sorooshian*

Prosecution witness Velisha Sorooshian gave four tape-recorded interviews to the police. Tape recordings of three interviews (those of May 8, 1992, June 3, 1992, and March 25, 1994) were turned over to the defense, but the tape of another interview from April 20, 1993, when Sorooshian was in custody, was belatedly discovered during trial by Detective William Osborn of the San Mateo County Sheriff's Office. Before Sorooshian testified, the prosecution provided the defense with a tape recording of her April 20, 1993, interview, which the prosecutor described as "the exact same statement" Sorooshian had given on the March 25, 1994, tape, which the defense already had in its possession.

Defendant argues that his opening statement to the jury would have corresponded more closely to the factual matters to which Sorooshian testified if the prosecutor had provided Sorooshian's April 20, 1993, taped interview before trial. Nonetheless, he had the recording of that interview before Sorooshian testified, and he suggests no specific prejudice apart from a slight variance between certain facts in his opening statement and the evidence adduced at trial, and accordingly he has failed to show prejudice from the belated disclosure.

### 3. *Leroy Lane*

Potential prosecution witness Leroy Lane gave two statements to the police. The prosecution provided the defense with a tape recording of Lane's May 10, 1994, interview. Shortly before Lane was scheduled to testify, the prosecutor discovered and disclosed a tape recording of an earlier phone conversation between a police detective and Lane on April 8, 1994. The prosecutor sought to introduce Lane's testimony about a debt defendant believed he was owed by victim Sadler, contending that the debt gave defendant a motive to kill Sadler.

The defense moved to exclude Lane's testimony at trial, arguing that Lane would testify that he had satisfied Sadler's debt by repaying defendant what Sadler owed defendant several months before Sadler was killed. Out of the jury's presence Lane took the stand, testified for the prosecution, and was cross-examined by the defense; the trial court then excluded Lane's testimony, finding the debt evidence temporally "too remote" to provide a motive for Sadler's murder.

Because Lane did not testify at trial, the belated disclosure of the April 8, 1994 taped conversation that might have impeached his testimony cannot have prejudiced defendant in any way.

### 4. Tony Harrison

On June 3, 1994, the prosecution turned over to the defense notes of an police interview with Tony Harrison. Harrison had quarreled with defendant over a bet in a dice game played on the afternoon of May 21, 1992, the day Morris was murdered. Harrison told the police that he harbored no ill feeling toward defendant after the argument and that his friend Ronald Morris was not present at the game. Defendant argues the prosecution's belated disclosure of Harrison's interview prevented defendant from establishing that when he encountered Morris on the evening of May 21, defendant was not harboring a grudge against Morris over the dice game. Defendant maintains that such evidence would have shown that he did not premeditate shooting Morris.

We note that Harrison was not a prosecution witness. The only trial testimony relating to the dice game was provided by two of its other participants, Shannon Senegal and Lavert Branner.

The trial court ordered the prosecutor to help the defense locate Harrison if it chose to call him as a witness, but the defense did not do so. Defendant fails to show how the belated disclosure of the police interview with Harrison, who did not testify at trial, was material to the defense.

### B. Concession of Guilt Without Advisements and Waivers

On appeal, defendant argues that when defense counsel in opening argument conceded that defendant had confessed to killing Bettencourt, counsel effectively pleaded defendant guilty to Bettencourt's murder, even though defendant received no formal admonitions and gave no express personal waivers of his constitutional rights to trial, to confront witnesses, and to stand silent. (*Boykin v. Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) This court long ago held that a defense attorney's decision not to contest one or more charges of murder at the guilt phase of a capital trial does not amount to a guilty plea requiring admonitions and waivers of the accused's constitutional rights. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1029 [251 Cal.Rptr. 643, 761 P.2d 103].) In light of the other charges being tried to the jury, such a defendant is both aware of and exercising those very constitutional protections. (*Ibid.*; see also *People v. Cox* (1991) 53 Cal.3d 618, 670–671 [280 Cal.Rptr. 692, 809 P.2d 351].) Defendant was present at jury selection, present during argument on pretrial motions, and present when the prosecution stipulated that it would not seek to admit into evidence his unwarned confession to killing Sadler. Therefore, defendant knew before defense counsel's opening statement that he was about to have a jury trial at

which he would be represented by counsel and would not have to testify. Defendant then exercised each of the three constitutional rights at his trial, where he argued that his killing of Bettencourt was at most second degree murder, or possibly not murder but involuntary manslaughter. Accordingly, even had there been error it would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

## C. *Preservation of Footprint Evidence*

When police, responding to the 911 emergency telephone call about Sadler, arrived at 2250 Menalto in East Palo Alto, there were footprints visible in the damp soil of the front yard. Although Detective Osborn asked the evidence technicians to photograph the prints, no photographs or casts were taken. Osborn compared one distinctive set of footprints leading up to the house to the shoes worn by Sadler, and concluded they were the same. That night, photographs were taken of the 11 occupants of the house, but those photographs were misplaced before trial.

Defendant contends that the police officers' failure to make casts or take photographs of the footprints and to retain photographs of the Menalto house occupants deprived him of exculpatory evidence, violated his right to due process under our state and federal Constitutions, and violated the Sixth and Eighth Amendments to the federal Constitution. Because defendant failed to raise this claim at trial, he is barred from doing so now. (*People v. Seaton, supra,* 26 Cal.4th at p. 656.)

Moreover, the claim is without merit. The footprints themselves neither implicated nor exonerated defendant; the one set that was tentatively identified belonged to murder victim Sadler and indicated that he had walked up to the house at 2250 Menalto. The physical evidence supported the eyewitness testimony that Sadler was beaten to death in the street. Absent a showing that the police acted in bad faith in not preserving evidence potentially useful to defendant, there has been no denial of due process. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 109 S.Ct. 333]; *People v. Frye, supra,* 18 Cal.4th at p. 943.) The testimony of Detective Osborn demonstrates that he tried to document evidence of the footprints with photographs but that, through no fault of his own, they were not taken.

As for the photographs that were taken of the house's 11 occupants but were found to be missing before trial, defendant has offered no suggestion that photographs of the persons found in the Menalto house some hours after Sadler's murder would exonerate him. In any event, the investigating officers took those photographs at the same time they compiled a list identifying the

11 occupants. That list was supplied to the defense and introduced at trial. Accordingly, defendant cannot show that the loss of the photographs precluded him from learning who was at the Menalto house after Sadler's murder. (*California v. Trombetta* (1984) 467 U.S. 479, 489 [81 L.Ed.2d 413, 104 S.Ct. 2528].)

### D. *Juror Questions*

Defendant complains that the jury had many questions it sought to ask of witnesses. He points to some 13 questions—most of which were asked and answered—as indicating that the jury improperly sought to investigate factual matters as if it were a party to the litigation.

Although the practice of allowing jurors to directly interrogate witnesses is justly criticized (*People v. McAlister* (1985) 167 Cal.App.3d 633 [213 Cal.Rptr. 271]), no such thing occurred here. The trial court required the jurors to submit in writing any questions they had of the court. Each question was then shown to counsel for both sides, and only after counsel acquiesced did the court itself ask the question of the witness. During the process outlined above, both sides were given the opportunity to object to juror questions.[5] Defendant, having raised no objections at trial, has forfeited any claim of error.

In any event, defendant's claim lacks merit. Most of the jurors' questions pertained to testimony by expert witnesses called by the prosecution.[6] Other questions posed by jurors asked for the meaning of slang used by witness that was unfamiliar to a member of the jury, a request to repeat the names of all 11 persons at 2250 Menalto on the night of Sadler's murder, questions that the court declined to answer without repeating the question in open court, a

---

[5] For example, when a juror requested that Inspector Sabin repeat the list of names of the 11 persons he had found at the Menalto house on the night of Sadler's murder both counsel responded, "That's fine." The prosecutor then asked defense counsel, "You would put that in?" Defense counsel responded, "Sure."

[6] After conferring with counsel, the trial court read juror questions to several prosecution expert witnesses. It asked San Mateo County criminalist Bruce Moran, who testified about the casings recovered from the scene of the Morris murder, "Generally, how many casings would a 9-millimeter Luger hold?" The court asked forensics expert Kelly Gallagher if a raincoat recovered close to Sadler's body had been "checked for fingerprints or blood spatters." The court asked firearms expert Nicholas Stumbaugh several questions about whether aluminum or brass casings would be more likely to display firing marks. The court asked criminalist William Lewellen about his comparison of tire tracks with two vehicles that were at the scene of Sadler's murder. The court asked Dr. Peter Benson, an expert witness in pathology and autopsy, who testified about the autopsies of Sadler and Bettencourt, to explain the origins of certain marks visible in autopsy photos of Bettencourt's body, and whether he had used autopsy photographs or notes and diagrams made during the autopsy to establish bullet trajectories. Each of these witnesses answered the juror questions posed to them.

request to see photographs that were not yet admitted into evidence, and two questions directed to the trial court regarding procedural matters. When the court received a note during the guilt phase from Juror R. stating, "I want to know if Mr. Cook has been receiving mental help," the court, at the request of the defense, responded by telling Juror R. it had sustained an objection to his question—without specifying what the question was in the presence of the jury—because it was irrelevant at "this phase of the proceedings." In sum, these questions do not indicate that the jurors took an adversarial role in the proceedings; instead, the jurors were seeking to understand the testimony of numerous witnesses, some of it on technical subjects, in a complicated trial involving three murders committed on separate occasions.

### E. *Prosecutorial Vouching*

Defendant contends the prosecution elicited testimony from law enforcement officers, especially from Inspector Bruce Sabin, who worked for the San Mateo District Attorney's Office but was assigned as the investigating officer to this case, vouching for or bolstering the credibility of prosecution witnesses, thus depriving defendant of his right to a fair trial under both the state and federal Constitutions.

█ It is improper for a prosecutor to offer assurances that a witness is credible or to suggest that evidence available to the government but not before the jury corroborates the testimony of a witness. (*People v. Frye, supra,* 18 Cal.4th at p. 971; *United States v. Necoechea* (9th Cir. 1993) 986 F.2d 1273, 1276.) In either case, prosecutorial comments may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence. (*United States v. Young* (1985) 470 U.S. 1, 18–19 [84 L.Ed.2d 1, 105 S.Ct. 1038].)

Defendant cites three instances of testimony by Inspector Sabin about his interviews with Shawnte Early, Keith Johnson, and Steven Sims, in which Sabin stated that he believed that certain portions of statements made by those witnesses were incomplete or untruthful.

Shawnte Early, who in a June 11, 1992 interview implicated defendant not only in the beating of Sadler but also in the shooting of Bettencourt, was at trial an extremely reluctant witness who claimed her pretrial statement was false. After Early had been extensively impeached at trial with her pretrial statement, the prosecutor called Inspector Sabin and questioned him about the circumstances of the June 11 interview. Inspector Sabin had already been cross-examined by the defense about whether he believed Early had been truthful in all the statements she made on June 11, and Sabin had testified that he did not think Early initially revealed all that she knew. On redirect

examination, the prosecutor revisited the subject, asking if Early's demeanor led Inspector Sabin to believe she was telling the truth. After the trial court overruled a defense objection made without a specified ground, Inspector Sabin testified that by the end of the interview he believed Early was being truthful, because she was cooperative and giving detailed information. Defendant does not argue that the trial court's evidentiary ruling was incorrect, and he has forfeited any statutory error by failing to state the specific ground for his objection. (Evid. Code, § 353, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

Nor did defendant complain at trial, as he now does, that the prosecution offered Inspector Sabin's testimony for an improper purpose that undermined his due process right to a fair and reliable trial.[7] Even if defendant has preserved a due process claim, we reject it on the merits. The trial court did not err in admitting Inspector Sabin's explanation of why he believed Early was truthful in her June 11 statement, which was a proper area of inquiry by the prosecution once the defense had explored Sabin's opinion of Early's veracity. (Evid. Code, § 800.) We are not persuaded that admission of Inspector Sabin's opinion of Early's truthfulness denied defendant a fair trial. Because the defense conceded at the outset of trial that defendant killed Bettencourt, the effect of any impropriety in Inspector Sabin's testimony was necessarily harmless as to defendant's conviction for the murder of Bettencourt. And Early's identification of defendant as Sadler's murderer was substantiated by the trial testimony of prosecution witnesses Ernest Woodard, Velisha Sorooshian, and Shannon Senegal.

Defendant also complains about testimony elicited by the prosecutor from Inspector Sabin about the credibility of witness Keith Johnson, who told the police on June 19, 1992, that defendant was Bettencourt's killer. On May 19, 1994, a few days before Inspector Sabin's testimony in question, the defense in cross-examination fully explored issues related to Johnson's credibility. On redirect examination by the prosecution, Johnson conceded that only as the June 19, 1992, interview proceeded did he offer a full account of Bettencourt's shooting.

On May 24, 1994, the prosecutor recalled Inspector Sabin, who testified that at the outset of his June 1992 interview with Johnson the latter disclaimed being at the crime scene but later gave a fuller account of the Bettencourt shooting. When the prosecutor asked, "Did he tell you what he saw?," Sabin responded, "Yes." Defendant construes Inspector Sabin's answer to mean that Johnson truthfully related what he had seen. Although defendant now complains that the prosecutor's question invited Sabin to

---

[7] Defendant here did not cite Evidence Code section 352 as the basis for his objection; indeed, he cited no specific ground. (See *People v. Partida, supra,* 37 Cal.4th 428, 435.)

vouch for Johnson's veracity, he did not object at trial, and accordingly he has forfeited the claim. (Evid. Code, § 353, subd. (a).) Assuming the trial court would have sustained an objection, we reject defendant's due process claim. Even if Inspector Sabin had vouched for Johnson's testimony, a conclusion we do not reach, any error was unquestionably harmless because defendant had admitted killing Bettencourt.

For the first time, defendant raises in his reply brief a similar claim as to Tomika Asburry, who was also a witness to the Bettencourt murder, and whose pretrial statement implicated defendant. At trial, she testified that she saw defendant approach Bettencourt's car. Eventually, she acknowledged hearing defendant yell, "You took my dope," and seeing Bettencourt shot. Asburry then qualified most of her testimony and said that she had lied on June 16, 1992, in her detailed statement to Inspector Sabin about defendant's shooting of Bettencourt.

Defendant complains that the prosecutor asked questions of Inspector Sabin designed to elicit answers from Sabin that vouched for Asburry's June 16, 1992 tape-recorded statement, which was played for the jury, when Sabin testified that on that day Asburry was "a little apprehensive" though "not scared" when she arrived for her interview. Defendant also points to Inspector Sabin's testimony that Asburry was a "cooperative" witness as additional evidence that Sabin characterized her as "a willing witness who told the truth, and not what [Sabin] told her to say."

Defendant did not object to the prosecutor's questions, and therefore has forfeited any claim of evidentiary error (Evid. Code, § 353, subd. (a)), and he cites no authority that it was improper for Inspector Sabin to testify to Asburry's demeanor. Lastly, it was the *defense*, not the prosecutor, who asked Sabin if he "viewed" Asburry as cooperative.

Finally, defendant complains of the testimony the prosecutor elicited from Inspector Sabin about witness Steven Sims, who while in custody in April 1992 contacted Sabin, offering information about what proved to be the Bettencourt murder. Defendant argues that the prosecutor's questioning at trial validated Sims's story as being corroborated. Defendant points to the prosecutor's question to Inspector Sabin about whether other witnesses present at the Bettencourt shooting "corroborated the fact that [Sims] was, in fact, at the [murder] scene." The trial court sustained defendant's objection, stating: "That's for the jury to decide. The jury will disregard the question and the answer." The trial court properly disallowed the question, which called for hearsay, and reminded the jury of its duty to determine witness credibility. Because defendant did not object to the prosecutor's question on the basis of due process, and his objection was sustained (*People v. Partida,*

*supra,* 37 Cal.4th at p. 435), we conclude defendant was not denied due process by the prosecutor's having posed the question.

### F. *Instruction on Involuntary Manslaughter*

The trial court instructed the jury on involuntary manslaughter as a lesser included offense of the killings of Bettencourt and Morris; the court did not, however, give that instruction as to the killing of Sadler. Defendant did not request the latter instruction with respect to Sadler's killing, but he now argues that the court was obliged to so instruct on its own initiative.

■ We independently review a trial court's failure to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218 [17 Cal.Rptr.3d 532, 95 P.3d 811].) The court must, on its own initiative, instruct the jury on lesser included offenses when there is substantial evidence raising a question as to whether all the elements of a charged offense are present (*ibid.; People v. Cunningham* (2001) 25 Cal.4th 926, 1008 [108 Cal.Rptr.2d 291, 25 P.3d 519]), and when there is substantial evidence that the defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant from guilt of the greater offense. (*People v. Cole, supra,* 33 Cal.4th at p. 1218.)

■ The elements of murder are an unlawful killing committed with malice aforethought. (§ 187.) The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. (*People v. Rios* (2000) 23 Cal.4th 450, 460 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) One commits involuntary manslaughter either by committing "an unlawful act, not amounting to felony" or by committing "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue. (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Malice is implied, however, when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221–1222 [264 Cal.Rptr. 841, 783 P.2d 200].)

Here, because the evidence conclusively showed that defendant brutally beat Sadler with a board, the jury could not have found that defendant committed a mere misdemeanor battery by administering that beating. Nor

was there any evidence that defendant lawfully attacked Sadler and continued to beat his head with a board, unaware that Sadler could die from the beating. Defendant did not simply start a fistfight in which an unlucky blow resulted in the victim's death. He savagely beat Sadler to death. Because the evidence presented at trial did not raise a material issue as to whether defendant acted without malice, the trial court was not obliged, on its own initiative, to instruct the jury on involuntary manslaughter as to victim Sadler.

Moreover, by convicting defendant of first degree murder instead of the lesser included offenses of second degree murder and voluntary manslaughter, the jury necessarily found that defendant acted with express malice, necessarily rejecting the view that the killing was manslaughter. Because the jury resolved the factual finding requisite to involuntary manslaughter against defendant, he cannot have been prejudiced by the lack of an instruction on involuntary manslaughter instruction. (*People v. Lewis, supra,* 25 Cal.4th at p. 646.)

### G. *Trial Court's Questioning of Witnesses*

Defendant contends the trial court abandoned its role as a neutral arbiter by asking clarifying questions of witnesses. He cites several instances in which the court asked its own questions of a witness. Defendant argues that this questioning cast the court into the role of an advocate for the prosecution, thereby infringing his constitutional rights to due process, an impartial jury, and reliable guilt and penalty determinations.

 A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony. (*People v. Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574]; Evid. Code, § 775.) The court may not, however, assume the role of either the prosecution or of the defense. (*People v. Carlucci* (1979) 23 Cal.3d 249, 258 [152 Cal.Rptr. 439, 590 P.2d 15].) The court's questioning must be " 'temperate, nonargumentative, and scrupulously fair' " (*People v. Hawkins, supra,* 10 Cal.4th at p. 948), and it must not convey to the jury the court's opinion of the witness's credibility. (*People v. Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23].)

Defendant complains of a question the trial court asked Steven Sims after Sims testified that he saw the Bettencourt killing and was one of the drug sellers who had rushed up to Bettencourt's car hoping to make a sale. Sims testified that in the jostling crowd of potential sellers surrounding the car he accidentally dropped the rock of cocaine he was offering into Bettencourt's car. Sims testified that he told defendant, who was arguing with Bettencourt, to "quit tripping," meaning cool down, and to "let me get my rock." After

both sides had completed their questioning of Sims, the trial court asked Sims if *defendant* said to Bettencourt, "Give me my money or my rock," or instead, "Give him [meaning Sims] his money or his rock." Sims replied that defendant said, "Give me my money or my rock." Defendant complains that Sims's answer to the court's question was evidence that defendant's admitted shooting of Bettencourt was a deliberate and premeditated act, and not merely second degree murder as the defense maintained.

Defendant further complains about a question the trial court asked criminalist Bruce Moran, inquiring about the size difference between a .45-caliber revolver and a nine-millimeter pistol. Moran explained that caliber could be described either in inches or in millimeters, but in either instance the measurement described the diameter of the gun barrel's bore.

Lastly, defendant complains of a question the trial court asked at the penalty phase of defendant's capital trial. After defendant's mother testified to problems defendant had as a teenager living in Germany, the court asked her whether school authorities there had contacted her after defendant fought with the high school coach. Because she responded that they had not, defendant contends the jury was given the impression that his mother had not been truthful in describing defendant's bad behavior.

Because defendant failed to object below to any of the trial court's questions, he has not preserved the issue for our review. (*People v. Harris* (2005) 37 Cal.4th 310, 350 [33 Cal.Rptr.3d 509, 118 P.3d 545].) Moreover, even if properly before us, the claim fails. The trial court's questions to the three witnesses were very few and neutrally phrased. The trial court, therefore, did not step outside its proper role of attempting to clarify witness testimony and trying to help the jury understand the evidence. Moreover, at the conclusion of both the guilt and penalty phases, the trial court instructed the jurors that they should not conclude from "any questions I may have asked" what "you should find to be the facts, or that I believe or disbelieve any witness," and reminded them to "form your own conclusion." (CALJIC No. 17.30.) That instruction reminded the jury of the trial judge's role as an impartial presiding officer whose occasional questions to witnesses were designed to clarify the evidence without favoring either side. (*People v. Monterroso* (2004) 34 Cal.4th 743, 782 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

Although answers by two witnesses (Sims and defendant's mother) to the trial court's questions may not have been favorable to the defense, the questions themselves did not create the impression that the court was allied with the prosecution. Defendant had conceded that he shot Bettencourt, and whether he did so because he believed Bettencourt was attempting to steal from him or from Sims did not make defendant less culpable of the murder.

Asking defendant's mother whether the school authorities in Frankfurt, Germany contacted her after defendant's fight with the high school coach was a question that could elucidate how seriously the authorities viewed the incident. She had already testified that when defendant arrived in Germany his attitude and demeanor had changed for the worse, and while there he got "into some trouble," resulting in his movements on the military base being limited to attending school and medical appointments. Thus, her answer did not suggest that she was unaware of defendant's misbehavior, or even that she sought to minimize it. The court's question did not undermine the mitigating evidence offered by defendant's mother. Accordingly, even were we to assume the court's questions were improper, any error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

### H. *Jury Instructions*

Defendant argues that the trial court on its own initiative should have instructed the jury under CALJIC Nos. 2.91 and 2.92, which describe the prosecution's burden of proving identity based solely on eyewitness identification and set forth factors to consider in proving identity by eyewitness testimony. A trial court has no duty to give either instruction on its own initiative. (*People v. Alcala* (1992) 4 Cal.4th 742, 802–803 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; accord, *People v. Ward* (2005) 36 Cal.4th 186, 213–214 [30 Cal.Rptr.3d 464, 114 P.3d 717].) Defendant argues that the court was, nevertheless, required to give the instructions at issue because many of the eyewitnesses present at the scenes of the murders gave vague descriptions but identified defendant as the perpetrator, despite not knowing him. Not so. Witnesses to the killings of Sadler and Morris were by no means all strangers to defendant. He was initially identified as Sadler's attacker by Shawnte Early, a young woman with whom defendant was going out, and he was identified at trial as the man fighting with Sadler by Ernest Woodard, who knew defendant by sight and by name before the killing. Defendant was identified as the shooter of Morris both by his cousin Shannon Senegal and by his close friend Lavert Branner. And defendant admitted that he shot Bettencourt, thus resolving the question of the shooter's identity. Here there was no conceivable reason the trial court was required on its own initiative to give CALJIC Nos. 2.91 and 2.92, instructing the jury to give defendant the benefit of reasonable doubt based on an eyewitness identification and to consider the various circumstances bearing on the accuracy of eyewitness identifications.

To impeach prosecution witness Valerie Gardley with a recorded pretrial statement to the police that was at odds with her trial testimony, the prosecution sought to play a tape recording of that statement to the jury.

Before playing the tape recording, however, the prosecution provided copies of its own transcription of the tape to the jury. A portion at the end of the transcript provided to the jury inadvertently mentioned a polygraph examination administered to Gardley. When that error was discovered, the transcripts were immediately retrieved and appropriately edited before the tape, minus its final portion, was played for the jury. Defendant complains that the court on its own initiative should have instructed the jury not to consider the polygraph exam. Absent any evidence, and there is none, that the jurors had already turned to the end of the transcript and learned of the polygraph test, the court had no obligation to give such an instruction.

The trial court instructed the jury with what was then the standard instruction on reasonable doubt (former CALJIC No. 2.90 (5th ed. 1988)), which included a definition of reasonable doubt as that which "is not a mere possible doubt; because everything relating to human affairs *and depending upon moral evidence* is open to some possible or imaginary doubt." (Italics added.) Although the United States Supreme Court expressed reservations about the italicized portion of that instruction, it upheld the instruction against constitutional challenge (*Victor v. Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583, 114 S.Ct. 1239]), and this court has repeatedly upheld the propriety of the instruction as well. (*People v. Heard* (2003) 31 Cal.4th 946, 979 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Lewis, supra,* 25 Cal.4th at pp. 651–652.)

The trial court orally instructed the jury that if it found that "defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter." (CALJIC No. 8.47.) Defendant complains that the trial court on its own initiative should have instructed the jury on the meaning of "unconscious" because, in his view, one may lack sufficient mental awareness to be unconscious as a legal matter, yet be capable of movement. Defendant having proffered no instruction defining the term "unconscious," we are unpersuaded that the trial court had a duty to provide its own. (*People v. Hughes, supra,* 27 Cal.4th at p. 343.) The trial court instructed the jury to consider defendant's intoxication in determining his mental state. The very language of CALJIC No. 8.47 (5th ed. 1988)—one who, "while unconscious as a result of voluntary intoxication, killed another human being" and who becomes voluntarily intoxicated "to the point of unconsciousness . . . assumes the risk that while unconscious [he] will commit acts inherently dangerous to human life or safety"—precludes the possibility that the jury would have believed legal unconsciousness required an incapacity to move and to act. (*People v. Boyer* (2006) 38 Cal.4th 412, 472 [42 Cal.Rptr.3d 677, 133 P.3d 581].) In light of the instruction given, the trial court had no duty on its own initiative to further define unconsciousness resulting from voluntary intoxication.

■ Defendant contends the trial court erred by not instructing on its own initiative that each count was a separate charge. (CALJIC No. 17.02.) He did not request that instruction, and a trial court has no duty to give it on its own motion. (*People v. Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1].)

Defendant cites what he describes as "incomprehensible" language in the reasonable doubt instruction given here (former CALJIC No. 2.90 (5th ed. 1988)), which defined reasonable doubt as the absence of "an abiding conviction to a moral certainty." In defendant's view, when that instruction is given, in conjunction with instructions on the sufficiency of circumstantial evidence (CALJIC No. 2.01) and the sufficiency of circumstantial evidence to prove specific intent (CALJIC No. 2.02), the reasonable doubt standard of proof is eroded to permit conviction on a lesser standard of proof. We have in the past rejected such a claim (*People v. Heard, supra,* 31 Cal.4th at p. 980; *People v. Navarette* (2003) 30 Cal.4th 458, 502 [133 Cal.Rptr.2d 89, 66 P.3d 1182]), and defendant offers no compelling reason for us to revisit the issue.

Defendant faults the trial court for not giving accomplice instructions as to prosecution witness Steven Sims, who testified he was trying to sell rock cocaine to murder victim Bettencourt just before the latter was killed. Defendant did not request accomplice instructions. Nor did defendant establish, as he must, by a preponderance of the evidence, that Sims was liable for Bettencourt's murder (*People v. Frye, supra,* 18 Cal.4th at p. 967), because he shared defendant's criminal intent. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335].) At best, the evidence established that Sims was one of several drug sellers who approached Bettencourt's car intending to sell cocaine to its driver.

■ Even if the trial court should have given such instructions, the error was harmless. The rationale for instructing a jury to view with caution an accomplice's testimony that incriminates the defendant is the accomplice's self-interest in shifting blame to the defendant. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].) Not giving such instructions, however, is harmless, even if erroneous, when there is "ample evidence corroborating the witness's testimony." (*People v. Arias* (1996) 13 Cal.4th 92, 143 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Here, there was ample corroboration by prosecution witnesses Nathan Gardner, Darnell Earby, Valerie Gardley, Keith Johnson, and Shawnte Early that it was defendant who, believing Bettencourt had attempted to steal rock cocaine from him, demanded return of his cocaine or payment, ordered Sims out of the way, and then shot Bettencourt.

I. *Torture Murder*

In addition to advancing a theory of first degree murder of Sadler based on a deliberate and premeditated intent to kill, the prosecution proceeded on an alternative theory of torture murder, and the trial court so instructed the jury. (CALJIC No. 8.24 (1992 rev.) (5th ed. 1988).) Defendant raises various claims of error. He argues first that murder by torture (§ 189) and CALJIC No. 8.24 describe a crime that is unconstitutionally vague, thus permitting jurors "unlimited discretion" to supply their own definition of the prohibited conduct. CALJIC No. 8.24 provides that one who commits murder by torture acts "with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." Here "persuasion" was deleted from the standard instruction. Defendant complains that the phrases "extreme and prolonged pain" and "any other sadistic purpose" are unconstitutionally vague. We have in the past rejected claims of unconstitutional vagueness as to both phrases (*People v. Raley* (1992) 2 Cal.4th 870, 898–900 [8 Cal.Rptr.2d 678, 830 P.2d 712]), and defendant advances no persuasive reason to revisit the question.

The elements of torture murder are: (1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. (§ 189; *People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People v. Cole, supra,* 33 Cal.4th at p. 1194.) The defendant need not have an intent to kill the victim (*People v. Mincey, supra,* 2 Cal.4th at p. 432), and the victim need not be aware of the pain. (*People v. Cole, supra,* 33 Cal.4th at p. 1207; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899].) An intent to torture " 'may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' " (*People v. Cole, supra,* 33 Cal.4th at pp. 1213–1214.)

Defendant argues there was insufficient evidence that he harbored an intent to inflict extreme and prolonged pain beyond the pain associated with dying (*People v. Bemore* (2000) 22 Cal.4th 809, 839 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Davenport* (1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861]); instead, he argues, the beating of Sadler, however brutal, was merely the result of a short explosion of violence, committed in the heat of passion. (*People v. Elliot* (2005) 37 Cal.4th 453, 467 [35 Cal.Rptr.3d 759, 122 P.3d 968].) We disagree.

A close look at the events surrounding Sadler's death belies defendant's claim. About 8:00 or 9:00 p.m. on February 8, 1992, Leonard Holt encountered Sadler, who had only $5 but wanted to buy cocaine. Holt suggested

Sadler visit 2250 Menalto, a known drug house. Sometime after 2:00 o'clock the next morning, Ernest Woodard and Shawnte Early, who were inside the Menalto house, awakened and went outside, where defendant and Sadler were engaged in a fistfight. Sadler eventually fell under the bed of a parked pickup truck, where defendant kicked and hit him. Early tried to persuade defendant to stop, but he continued to hit Sadler's face with a stick, although the latter had ceased to resist and was no longer moving. She pulled defendant away from the attack, but he resumed hitting Sadler. Eventually Early got defendant into her car, and they drove around the corner and parked. Defendant then announced, "I should have killed that mother." He got out of the car and ran back to Menalto. By the time Early drove back to Menalto, defendant was once more hitting Sadler with a stick. Early heard him say, "Man I should kill this motherfucker[;] man I'm set to kill this motherfucker." Early went into the house briefly, and when she came outside again she saw defendant leave the scene in a car driven by another man.

Holt and Velisha Sorooshian arrived at 2250 Menalto sometime after the fight. They were sitting in her car smoking crack when defendant and another man drove up. From the passenger seat defendant laughingly asked Sorooshian if she would go see whether the man down the street was all right.

Defendant's conduct and his statements to Early are consistent with his undertaking the attack on Sadler without an intent to kill, but with the intent to inflict extreme pain by kicking and beating Sadler's face even after the latter lay unresisting in the street. An intent to cause extreme pain is consistent with Sadler's injuries. X-rays revealed that Sadler suffered no broken bones, except for fractures of virtually all of his facial bones, injuries which caused so much bleeding that he was asphyxiated by his own blood.

Because we conclude that substantial evidence supports the jury's finding that Sadler's killing was a torture murder, we necessarily reject defendant's claim that the prosecutor's closing arguments, made to the jury at both the guilt and penalty phases, characterizing Sadler's murder as torture murder, violated defendant's rights to due process and a fair trial or subjected him to cruel and unusual punishment.

■ Defendant additionally argues that the prosecutor failed to prove that defendant premeditated Sadler's killing and that it was deliberate. Not so. Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection. (*People v. Manriquez* (2005) 37 Cal.4th 547, 577 [36 Cal.Rptr.3d 340, 123 P.3d 614]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 [12 Cal.Rptr.3d 592, 88 P.3d 498].) Defendant's ride around the corner after his initial attack on Sadler gave him such an opportunity. Defendant's statement, "I should have killed the mother," made

before he got out of Early's car, is consistent with his forming an intent to kill Sadler during the hiatus in the beating. When he then resumed beating Sadler and announced, "Man, I'm set to kill this motherfucker," defendant unmistakably expressed an intent to cause Sadler's death. Thus, substantial evidence supports the prosecution's theory that Sadler was the victim of a deliberate and premeditated killing by defendant.

In light of the ample evidence supporting defendant's conviction of Sadler's first degree murder, under a theory either of torture murder or of deliberate and premeditated murder, we reject defendant's contention that insufficient evidence supports his conviction of that crime or that he was denied his constitutional rights to a fair and impartial trial.

### J. Sadler Verdict Form

■ Defendant complains that the verdict form for the charge of first degree murder of Sadler did not require the jurors to unanimously agree on which of the two theories advanced—deliberate and premeditated murder or torture murder—they relied. We have in the past rejected the claim that the jurors must unanimously agree on the theory (*People v. Jenkins* (2000) 22 Cal.4th 900, 1025 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1185 [9 Cal.Rptr.2d 834, 832 P.2d 146]) as has the United States Supreme Court (*Schad v. Arizona* (1991) 501 U.S. 624, 631–632 [115 L.Ed.2d 555, 111 S.Ct. 2491]).

### K. Instruction on Involuntary Manslaughter

The trial court gave the jury standard instructions with respect to the shootings of Bettencourt and Morris on involuntary manslaughter and on killings committed when voluntarily intoxicated. (Former CALJIC Nos. 8.45 & 8.47 (5th ed. 1988).) It orally instructed the jury using CALJIC No. 8.47: "If you find that a defendant, *while unconscious* as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] When a person voluntarily induces his own intoxication *to the point of unconsciousness*, he assumes the risk that while unconscious he will commit acts inherently dangerous to human life or safety. Under such circumstances, the law implies criminal negligence." (Italics added.) After that instruction was read to the jury, defense counsel asked for deletion of the language italicized above from the written instructions. The court so modified the written instructions given to the jury. Defendant contends that the instruction required defendant be literally incapable of movement as a result of intoxication in order to negate his intent to kill. Not so. Both the oral and the written instruction described a killing committed "while unconscious" and instructed

that one who is voluntarily intoxicated assumes the risk that "while unconscious he will commit acts inherently dangerous to human life or safety." In sum, the jury was instructed that one may be in a state of unconsciousness resulting from voluntary intoxication but retain the capacity to perform physical acts. Thus, under both the instruction as orally given to the jurors and that given to them in writing, the jury was adequately informed that unconsciousness caused by voluntary intoxication did not require defendant to be incapable of movement. (*People v. Boyer, supra,* 38 Cal.4th at p. 472 [unedited version of CALJIC No. 8.47]; *People v. Hughes, supra,* 27 Cal.4th at pp. 343–344 [unedited version of CALJIC No. 8.47].)

Defendant also argues that the written version of CALJIC No. 8.47 given to the jury was vague and confusing, because it retained "while unconscious" in the second sentence. We disagree. Here the jury had heard defendant's statement that he had no memory of shooting Morris; evidence that defendant had consumed large quantities of alcohol both before Morris was shot and on the day he shot Bettencourt; and argument by the prosecutor that, in light of defendant's conduct immediately before and after each shooting, defendant's drunkenness had not negated his intent to kill or his awareness of the risk to human life. Moreover, after reading the elements of involuntary manslaughter, the court specifically alerted the jury that "this ties in with voluntary intoxication," mentioning defendant's "alcohol unconsciousness defense" and noting the relevance of that defense to whether the actor formed an intent to kill. In light of the instructions as a whole, the evidence, and the prosecutor's argument, we cannot say that the jury was misled.

### L. *Prosecutor's Leading Questions*

Defendant accuses the prosecutor of asking many leading questions and introducing into evidence tape recordings of witness interviews conducted by the police that likewise contained leading questions. In defendant's view, the cumulative impact of those questions denied him a fair trial.

Defendant does not specify which questions were problematic, but instead cites to 18 pages in the trial transcript. The instances of prosecutorial leading questions cited by defendant fall into two categories: (1) questions directed to law enforcement witnesses who were generally being asked to summarize their earlier testimony or to identify certain locations on a diagram, and (2) questions directed to eyewitnesses who were either reluctant to testify or whose earlier testimony seemed unclear. In only two instances did the defense object at all, and only once did it object to a question as leading; the trial court overruled defendant's single leading question objection. Except as to the two questions to which defendant objected, he has forfeited any claim of evidentiary error. We are not persuaded that these relatively few leading

questions, asked during a two-and-a-half-month trial involving three murders and many witnesses, either individually or collectively denied defendant a fair trial, even assuming defendant had preserved the issue for review by having made timely objection to the form of all of the questions of which he now complains. (*People v. Dennis* (1998) 17 Cal.4th 468, 530 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

Defendant further complains about leading questions that were posed, not by the prosecutor, but by law enforcement officers to witnesses in the course of pretrial police questioning that was recorded and played at trial. Defendant cites no authority prohibiting the police from asking leading questions of witnesses to a crime.

### M. *Prosecutorial Misconduct*

Defendant claims for the first time on appeal that the prosecutor in his opening statement committed misconduct by seeking to inflame the passions of the jury through graphic descriptions of rampant drug dealing, drug use, and witness intimidation in East Palo Alto at the time these murders were committed there, and in doing so relied on facts that never came into evidence.

**(19)** A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Under state law, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Frye, supra,* 18 Cal.4th at p. 969.) To preserve a misconduct claim a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the misconduct claim preserved for review. (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

Here defendant made no such misconduct objection at trial. Accordingly, he has forfeited the claim. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Cunningham, supra,* 25 Cal.4th at p. 1001.) Even assuming defendant has preserved the claim, it lacks merit. The evidence at trial amply confirmed that at the time and place of the killings there was an open and active drug trade in which many of the witnesses, at least two of the victims, and defendant himself participated. Thus, the prosecutor's opening argument did no more than outline what the evidence would, and did, show.

Defendant further asserts that the prosecutor engaged in "rampant speculation" when he said in his opening statement that defendant had demanded that Sadler repay him the $20 that defendant believed Sadler owed from an earlier transaction between them involving a videocassette recorder. Defense objections to that evidence were later sustained, and the potential witness with knowledge of the $20 debt, Leroy Lane, did not testify. As the jury was instructed that the prosecutor's opening statement was not evidence, and no evidence was offered that an outstanding debt had provided defendant with a motive to kill Sadler, defendant suffered no prejudice from the prosecutor's statement at issue.

Defendant argues that throughout the guilt phase the prosecutor impermissibly sought to shift the burden of proof. He points first to a short series of questions the prosecutor asked of criminalist Nicholas Stumbaugh, who had compared the autopsy bullets removed from murder victims Bettencourt and Morris. Stumbaugh concluded the bullets were fired from the same weapon. The prosecutor then asked Stumbaugh if the defense could have subjected the autopsy bullets to its own testing by an independent laboratory. A defense objection to the question as argumentative was overruled. Only on appeal does defendant contend that the question improperly shifted the burden of proof to the defense. Because defendant failed to object to the question on that ground at trial, he has forfeited that claim. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1214.) Moreover, the prosecutor did not ask whether the defense had a duty to do independent testing, merely whether the defense had an opportunity to do so. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Pointing out that contested physical evidence could be retested did not shift the burden of proof.

Defendant also complains about comments the prosecutor made during closing argument at the guilt phase. Defendant asserts dual claims as to many of them, arguing first that they constituted prosecutorial misconduct, and second that they impermissibly shifted the burden of proof.

Defendant contends that in closing argument at the guilt phase the prosecutor shifted the burden of proof by asserting the defense had offered only "innuendo and conjecture," rather than evidence, in support of its theory that someone other that defendant had killed Morris.

In response to the defense theory that two different guns were used in the Bettencourt and Morris killings, the prosecution said: "So where is the second gun? The defense can call criminalists . . . . They can; they don't. [¶] It's a lot easier to sit up here and try to sort of slant the truth for you all hoping to somehow hoodwink one of you perhaps, hang this case." After the defense objected, asserting that the prosecutor was "burden shifting," the trial court

reminded the jury that the prosecution had the burden of proof. The prosecutor acknowledged that he had the burden of proof, but he again argued to the jury that defendant had the right to produce a criminalist who could have testified whether the bullets were consistent with two different guns having been used to kill Bettencourt and Morris. He then said: "Instead, it is a lot easier [for the defense] to get up here and just create smoke. That's what you just got, an hour and 20 minutes worth." Defendant's renewed objection was overruled.

A prosecutor may make fair comment on the state of the evidence. (*People v. Hughes, supra,* 27 Cal.4th at p. 372; *People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) Here the trial court properly admonished the jury that "the burden of proof is always on the People to prove the allegations of the information," and that "the defense does not have to prove anything." The argument constituted fair comment on the absence of evidence of a second gun. Moreover, by characterizing defense counsel's argument as "smoke," the prosecutor used a metaphor that, while clearly dismissive of the defense's theory, did not improperly impugn the integrity of defense counsel. (See *People v. Frye, supra,* 18 Cal.4th at p. 978.)

Because there was neither burden shifting nor misconduct by the prosecutor, defendant has not established prejudice justifying reversal under the state law test requiring a reasonable likelihood of a more favorable verdict in the absence of the challenged conduct. (*People v. Lenart, supra,* 32 Cal.4th at p. 1130; *People v. Ochoa, supra,* 19 Cal.4th at p. 464.) Even if we were to conclude that these instances constituted error, which we do not, applying the test pertaining to error of federal constitutional dimension, we conclude that the prosecutor's comments and questioning were harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

### N. *Cumulative Error*

Defendant maintains that the cumulative effect of the various errors he claimed occurred at the guilt phase requires reversal. Having rejected on the merits each of defendant's claims of error, we reject his claim that he was prejudiced by their cumulative impact.

### IV. PENALTY PHASE ISSUES

### A. *Photographs of Victims and Their Children*

Defendant contends that he was prejudiced by the admission during the prosecutor's penalty phase case of photographs of murder victims Sadler and Morris, a photograph of one of murder victim Bettencourt's two teenage

daughters, and a photograph of murder victim Morris's two-year-old daughter. Defendant argues that these photographs were improper victim impact evidence lacking relevance and designed to inflame the jurors' passions.

Evidence of the impact a victim's death has on their family members is evidence of "the specific harm caused by the crime" (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597]), and accordingly is properly admitted as a circumstance of the crime under section 190.3, factor (a). (*People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

Photographs of Sadler and Bettencourt taken before their deaths were introduced at the guilt phase and used by the prosecutor to elicit identifications from witnesses. Defendant did not object then, nor did he do so when the same photographs were used again at the penalty phase; therefore, defendant has not preserved any claim of error as to those photographs.

At trial, defendant objected to the admission of seven photographs of one of murder victim Bettencourt's daughters, and the court limited the prosecutor to showing a single picture of each of the victim's children. In light of that ruling, defendant maintains it would have been futile for him to object to the photograph of victim Morris's young child. Without deciding whether a second objection was necessary here, we reject defendant's claim on the merits.

Murder victim Bettencourt's mother testified that her son's two teenage daughters were "very close" to him; thereafter, a snapshot of one of them from his wallet was admitted into evidence. A photograph taken of Morris's two-year-old daughter was identified by his mother, who testified that her son's death meant that the little girl would "never, ever know the love he had for her."

Neither of Bettencourt's teenage daughters testified, although both were old enough to have done so. Testimony from the victims' children as to how their father's death affected them would have been proper victim impact evidence. (*People v. Boyette, supra,* 29 Cal.4th at pp. 444–445.) Instead two photographs, one of a Bettencourt daughter and one of Morris's toddler, were introduced to show the jury two children whose lives were affected when defendant murdered their fathers. The photographs were proper victim impact evidence. (*People v. Stitely, supra,* 35 Cal.4th 514, 564–565 [26 Cal.Rptr.3d 1, 108 P.3d 182].) Such minimal photographic evidence, coupled with the brief testimony by each grandmother, falls far short of a quantity of evidence that might deny defendant's right to due process. (See *People v. Robinson* (2005) 37 Cal.4th 592, 644–652 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

## B. *Aggravating and Mitigating Circumstances*

Defendant contends the trial court erred in not deleting one of the aggravating factors and several mitigating factors described in section 190.3 because they were inapplicable to the evidence. Specifically, he argues that factors (c) (prior felony conviction), (e) (victim participant in or consented to homicidal act), (g) (act under extreme duress or substantial domination of another), and (j) (accomplice or participation relatively minor) should have been deleted from jury instruction CALJIC No. 8.85. A trial court has no obligation to omit inapplicable factors from a jury instruction. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1138 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

Citing various passages in the prosecutor's argument describing the juror's task of weighing aggravating and mitigating factors, defendant claims that the prosecutor improperly told the jury to consider each factor, including those without relevance here. Defendant failed to preserve the claim, because he did not object to the argument or request an admonition to the jury. (*People v. Hinton, supra,* 37 Cal.4th at p. 907.) The claim is also without merit. In argument, the prosecutor itemized section 190.3, factors (c), (e), (g), and (j), expressly telling the jury that they were not applicable in this case. The prosecutor specifically told the jury that defendant's prior juvenile adjudication for possessing cocaine was not a felony conviction (§ 190.3, factor (c)), asserting, "This is a non-factor," and stating, "There is nothing to consider in factor (c)." The jury received a standard instruction, which permitted it "to assign whatever moral or sympathetic value you deem appropriate to each and all the various *factors you are permitted to consider.*" (CALJIC No. 8.88, italics added.) We assume the jury followed that instruction.

Defendant also contends that by discounting the merit of defense evidence offered in mitigation, the prosecutor invited the jury to use the absence of mitigating evidence as an aggravating circumstance. Under section 190.3, factor (e), the jury at penalty phase considers "whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act." The prosecutor argued that there was no evidence to support factor (e) as a mitigating factor in this case, because none of the victims was a participant in his own murder, and all of them were "unsuspecting vulnerable victims preyed on by Walter Cook." Again, defendant did not object and has forfeited his claim of error. Moreover, the prosecution's argument here was not that the absence of factor (e)—the victim's participation in or consent to the homicidal act that resulted in their death—made the murders more aggravated than other murders (*People v. Davenport, supra,* 41 Cal.3d at pp. 288–289), but that mitigating factor (e) was not presented by the evidence at trial.

Defendant argues that the prosecutor erred in telling the jury that although it could not use defendant's lack of remorse as an aggravating factor, it could use his lack of remorse "to nullify some of the factors of mitigation that the defense will be asking you to find in factor (k)," which permits consideration of "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse" for it. (§ 190.3, factor (k).) Defendant failed to preserve the issue by not objecting to the comments or requesting admonition to the jury. (*People v. Hinton, supra,* 37 Cal.4th at p. 907.)

■ Although "a prosecutor in a capital case may not argue that a defendant's postcrime lack of remorse is an aggravating factor, a prosecutor may . . . argue that lack of remorse is relevant to the evaluation of mitigating factors." (*People v. Jurado* (2006) 38 Cal.4th 72, 141 [41 Cal.Rptr.3d 319, 131 P.3d 400]; see *People v. Mendoza, supra,* 24 Cal.4th at p. 187.) Here, the prosecutor correctly told the jury that it could not use defendant's lack of remorse as an aggravating factor. Arguing that defendant exhibited no remorse after the three murders, the prosecutor urged the jury to reject the defense claim that defendant's violent childhood and fragile personality were mitigating circumstances. Because remorse is relevant to the jury's death penalty determination, it is not misconduct for a prosecutor to refer to a defendant's lack of remorse. (*People v. Hinton, supra,* 37 Cal.4th at p. 907.)

## C. *Instruction on Other Criminal Acts*

■ The trial court instructed the jury in the language of CALJIC No. 8.87 that it could consider as evidence in aggravation (§ 190.3, factor (b)) four instances of defendant's unadjudicated crimes involving force or violence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1070 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Although the court specifically described each instance (exhibiting a deadly weapon, a gun, to Geraldine Cook in a threatening manner; battering the coach and Markus Hallgrimson at a basketball game in Germany; and threatening and obstructing Officer Phillip Johnson at a crime scene in East Palo Alto), defendant argues the court erred by not setting out the elements of each of those crimes. Defendant, however, did not request an instruction on the elements of the offenses, and a trial court has no duty on its own initiative to instruct on the elements of unadjudicated offenses. (*People v. Carter* (2003) 30 Cal.4th 1166, 1227 [135 Cal.Rptr.2d 553, 70 P.3d 981].) In the past, we have held that an instruction on the elements of crimes adduced as evidence in aggravation is not required "by logic or by the constitutional guarantees of due process, fundamental fairness, right to a fair trial, equal protection, or reliability of penalty." (*People v. Lewis, supra,* 25 Cal.4th at p. 668.) Accordingly, the trial court did not err in not instructing the jury on the elements of unadjudicated crimes offered as circumstances in aggravation.

### D. *Instruction on Limited Use of Defendant's Statements*

At the penalty phase, Dr. George Wilkinson, a psychiatrist, testified as a defense expert and gave a mental health assessment of defendant, based partially on reports and testing done by other physicians. On appeal, defendant contends that the trial court had a duty to instruct the jury on its own initiative that a defendant's statements made in an examination to diagnose or treat the defendant are admissible for "the limited purpose of showing the information upon which the medical expert based" his or her opinion. (CALJIC No. 2.10.) As a subsequently written use note indicates, this instruction "generally is applicable when the expert is court appointed and testifies at the guilt phase after the defendant has placed his mental condition in issue." (Use Note to CALJIC No. 2.10 (7th ed. 2003); see *People v. Nicolaus* (1967) 65 Cal.2d 866, 879–880 [56 Cal.Rptr. 635, 423 P.2d 787].) Here, Dr. Wilkinson testified for the *defense* at the *penalty* phase. The trial court thus had no duty to give the instruction.

### E. *Prosecutorial Misconduct*

Defendant makes several claims of prosecutorial misconduct. Earlier we summarized the law governing claims of prosecutorial misconduct. (See pp. 606–608, *ante*.)

#### 1. *Plea on behalf of the victim*

The prosecutor opened his penalty phase argument by reading part of the prologue to a book written about a murder victim unrelated to this case. The text describes how, after a murder, "the dead person ceases to be a part of everyday reality, ceases to exist," as the survivors "inevitably turn away from the past, toward the ongoing reality," which includes the victim's killer who is "trapped, anxious, now helpless, isolated often badgered and bewildered." Thus, the culprit "usurps the compassion that is justly his victim's due."[8] Defendant objected to the passage on the ground that it was a plea for juror sympathy and unduly prejudicial, but the trial court overruled the objection, concluding that had the prosecutor written it himself he could have made the same argument in his own words.

Defendant argues that reading this passage was improper because it focused on the victims' families, although the book was not written about the families of the victims in this case, thus making an improper appeal to the sympathies of the jurors. We find nothing objectionable on either ground

---

[8] The passage is apparently taken from Gaylin, The Killing of Bonnie Garland (1982). (See *People v. Rowland* (1992) 4 Cal.4th 238, 278, fn. 17 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

asserted. As we have observed in the past, the text read to the jury is a reminder that the victims of murder are absent from the courtroom, but the living defendant is present. (*People v. Rowland, supra,* 4 Cal.4th at pp. 277–278, fn. 17.)

### 2. *Impugning integrity of defense counsel*

In closing argument to the jury, the prosecutor analogized defense counsel to political "spin doctors"—that is, partisan political operatives who seek to cast the performance of their candidate in the most positive light—thereby suggesting the defense put "an unfair spin on the evidence." Defendant did not object at trial, and thus he has forfeited any claim of error.

The prosecutor was discussing defendant's mother's testimony when he made the comment about which defendant now complains. Defendant's mother testified to an episode during defendant's childhood when, after the couple's divorce, defendant's father took defendant from a birthday party without her permission. The prosecutor described it as "the kidnapping that the defense has put that heavy spin on." The defense objected to "the characterization," describing it as "derogatory and demeaning," but the trial court overruled the objection stating, "[I]t's hyperbole." The prosecutor proceeded to develop the theme that defendant's mother was overstating the domestic violence and dislocation that defendant suffered as a child.

██ Defendant objected to the prosecutor's "heavy spin" comment, although not on the basis that he now advances on appeal, which is that it denigrated the integrity of defense counsel. As mentioned earlier, a prosecutor commits misconduct by impugning the integrity of defense counsel. (*People v. Cash, supra,* 28 Cal.4th at p. 732; *People v. Bemore, supra,* 22 Cal.4th at p. 846.) Nonetheless, we allow prosecutors wide latitude in penalty phase argument, so long as the beliefs they express are based on the evidence presented. (*People v. Ochoa, supra,* 19 Cal.4th at p. 463.) Here, there was evidence that, although defendant's mother was distressed when his father took defendant, then a young boy, from a family birthday party without her permission, she resolved the matter by retrieving the boy, and sending him to Texas to live with her mother. The disparity between that evidence and its characterization at trial as a kidnapping was a legitimate subject of prosecutorial comment.

In closing argument to the jury, the prosecutor commented on the fees paid to the defense mental health expert witness, stating, "for 124 hours at $225 per hour, Dr. Wilkinson comes up with something that excuses this man's responsibility." That comment, defendant claims, implied that Dr. Wilkinson "gave false testimony for a fee," thereby impugning defense counsel's

integrity for having, in effect, bought the expert's testimony. Because of his failure to object at trial, defendant has forfeited the claim. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) In any event, although counsel may not denigrate the integrity of opposing counsel, an attorney is free to argue that the opinions of paid expert witnesses may be biased. (*People v. Arias, supra,* 13 Cal.4th at p. 162.)

### 3. *Biblical references*

During questioning of defendant's mother and his grandmother, the prosecutor asked whether defendant knew the Ten Commandments, including "Thou shalt not kill." (Exodus 20:13.) Defendant accuses the prosecutor of misconduct for inserting biblical references into the trial. It is misconduct for a prosecutor to argue that biblical authority supports imposing the death penalty, because it suggests to the jurors that they may follow an authority other than the legal instructions given by the court. (*People v. Lenart, supra,* 32 Cal.4th at p. 1129.) To preserve such a claim the defendant must make a timely objection and seek a curative admonition or any error is forfeited. (*Ibid.; People v. Ervin* (2000) 22 Cal.4th 48, 100 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Defendant did not object to the questions, and so he has forfeited any claim of error.

### 4. *Inviting jurors to ignore defendant's youth*

In closing argument at the penalty phase, the prosecutor told the jury that defendant deserved the death penalty by committing the three murders. "One does not receive the dubious honor of the death penalty in a vacuum," rather "you earn it" whether "it takes you 68 years or 18 years." Defendant contends that this line of argument invited the jury to ignore defendant's youth (he was 18 at the time he committed the three murders), which is a statutory circumstance in mitigation (§ 190.3, factor (i)), and he accuses the prosecution of thereby violating his right to due process. Because defendant failed to object at trial, he has not preserved the issue. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Even if he had, the claim would fail on the merits. The age of a defendant is a legitimate subject for argument by both the prosecution and the defense. (*People v. Box* (2000) 23 Cal.4th 1153, 1215 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

### 5. *Alleged comment on defendant's rights*

Defendant complains that in closing argument at the penalty phase the prosecutor urged the jury to impose the death penalty because a verdict of life without possibility of parole "would be leniency." The prosecutor continued, "[H]e gets rights," including "two attorneys to defend him," and "four

doctors," and "a worldwide investigation." The prosecutor concluded, "You decide if he is guilty or he is not guilty," adding "that's a heck of a lot better system of justice than the justice that he imposes on his victims."

Defendant complains that the argument amounts to an impermissible comment upon the exercise of his constitutional rights and in effect urged the jury to impose death in retaliation for defendant's exercise of those rights. Because at trial defendant made no objection to this argument, he has forfeited the claim he now raises. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Moreover, the prosecutor never suggested to the jury that it should penalize defendant for having exercised his rights. Accordingly, we see no reasonable likelihood that the jury misconstrued or misapplied the prosecutor's comments, and we find no error. (*People v. Roybal* (1998) 19 Cal.4th 481, 514 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

### F. Denial of Mistrial

After the jury deliberated for a day and a half, it reported that it was deadlocked. Polling revealed that after five ballots there was a single holdout juror. Defendant moved for a mistrial, but the trial court denied the motion, instructing the jury to continue deliberating at least for the afternoon, telling the jurors to "try your best," and adding, "if you can't [reach a verdict], you can't." During those deliberations the jurors sent a note asking what a mistrial would mean. The court responded that in the event it declared a mistrial, the guilt phase verdicts would "stand." The court continued: "However, the penalty phase following a mistrial may be retried to a new jury, unless the district attorney and court agree to life without possibility of parole, which is the lesser of the two penalties." At the end of the afternoon, the court learned that the jury wanted to return the next day for deliberations. After the court confirmed with all the jurors that this was their desire, it sent them home.

Defendant complains that by not immediately declaring a mistrial when the jury announced it was deadlocked, the trial court conveyed the message that the jury was to continue deliberating until the holdout juror's vote changed. Defendant claims that the court's inaction resulted in denial of his constitutional right to due process.

 Section 1140 provides that a jury may be discharged without reaching a verdict if "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." Determining whether there is a reasonable probability of jury agreement is left to the sound discretion of the trial court. (*People v. Proctor* (1992) 4 Cal.4th 499, 539 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) Nothing in the record suggests judicial coercion of the holdout juror, and the jury's

decision to continue deliberating the next day suggests that it had overcome whatever impasse it had reached in deliberations. The court did not abuse its discretion in declining to declare a mistrial.

### G. Pitchess *Motion*

Officer Phillip Johnson testified at the penalty phase to an incident on January 14, 1992, when, after defendant refused to leave a cordoned crime scene, the officer arrested him for resisting a police officer's order. Before Officer Johnson testified, defendant brought a motion to discover the existence of citizen complaints made against the officer for misconduct, including dishonesty, false arrest, or fabrication of charges or of evidence. At a hearing in chambers, the trial court examined the officer's personnel records, found only one relevant incident out of a total of four, and released to the defense the name, address, and telephone number of the complainant. Defendant contends that he should have been given more information, both about the three complaints that the court declined to disclose and about the circumstances involving the fourth complainant. Additionally, he complains that a fifth complaint was not disclosed. He maintains the court's failure to disclose more information from the officer's personnel file denied him due process.

Named after *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305], and now codified in Evidence Code sections 1043–1045, a motion to discover information from a police officer's personnel file permits disclosure of confidential information only under specified conditions. (See *City of Los Angeles v. Superior Court, supra,* 29 Cal.4th at pp. 19–20.) Defendant here makes no showing that he was entitled to additional information from Officer Johnson's personnel file. Regardless of whether the trial court abused its discretion, any *Pitchess* error relating to Officer Johnson was harmless either under the test for state law error of whether there is reasonable possibility that the error affected the penalty verdict (*People v. Ashmus* (1991) 54 Cal.3d 932, 990 [2 Cal.Rptr.2d 112, 820 P.2d 214]) or under the beyond a reasonable doubt test (*Chapman v. California, supra,* 386 U.S. at p. 24) applicable to denial of discovery that implicates the federal constitutional guarantee of due process (*Wardius v. Oregon* (1973) 412 U.S. 470, 474–476 [37 L.Ed.2d 82, 93 S.Ct. 2208]). Officer Johnson testified to one of four unadjudicated crimes offered by the prosecution. Here defendant made a profane comment, implicitly threatening physical violence to Officer Johnson. Even had the officer been impeached as an unbelievable witness, his testimony was redundant to the three other violent incidents offered by the prosecution as aggravating factors under section 190.3, factor (b).

### H. *Challenges to California's Death Penalty Law*

Defendant contends that many features of California's capital sentencing scheme, either singly or together, offend the federal Constitution's Fifth, Sixth, Eighth, and Fourteenth Amendments. We have in the past rejected identical claims, and, despite his urging that we reconsider those holdings, he has presented no compelling reason for us to do so here. Defendant's claims and the cases rejecting them are listed below.

#### 1. *Death eligibility*

Our death penalty is neither vague nor arbitrary, because it accords wide discretion to prosecutors to seek the death penalty. (*People v. Harris, supra,* 37 Cal.4th at p. 366; *People v. Lenart, supra,* 32 Cal.4th at p. 1136.) California's statutory special circumstances (§ 190.2) adequately narrow the class of death-eligible offenders. (*People v. Hinton, supra,* 37 Cal.4th at p. 913; *People v. Michaels* (2002) 28 Cal.4th 486, 541 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Kipp, supra,* 26 Cal.4th at p. 1136.) The law is not overbroad either because of the number and scope of special circumstances defining capital murder, or because it permits a capital charge based on felony murder. (*People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222]; *People v. Anderson, supra,* 25 Cal.4th at p. 601.) Our death penalty law is not infirm because murders arising from crimes that are commonly committed are likely to qualify as capital crimes under a special circumstance. (*People v. Catlin* (2001) 26 Cal.4th 81, 158 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80].)

#### 2. *Penalty determination*

Section 190.3's aggravating and mitigating factors and the corresponding CALJIC jury instruction (CALJIC No. 8.85 (5th ed. 1988)), which lists each of the statutory aggravating and mitigating factors,[9] are not impermissibly vague (*People v. Kipp, supra,* 26 Cal.4th at p. 1137 [factors (a) & (b)];

---

[9] Defendant's briefing on this claim repeatedly cites CALJIC No. 8.84.1 (1986 rev.). The version of 8.84.1 to which defendant refers was not given at this trial; instead a more recent version (CALJIC No. 8.84.1 (1989 new) (5th ed. 1988)) was given. It provides: "You will now be instructed as to all of the law that applies the penalty phase of this trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial. [¶] You must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings. Both the People and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict." The 1989 instruction given here was drafted in response to this court's decision in *People v.*

*People v. Griffin* (2004) 33 Cal.4th 536, 598 [15 Cal.Rptr.3d 743, 93 P.3d 344] [factors (d) & (h)]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [factor (i)]). Therefore, they do not give rise to arbitrary or capricious death sentences. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 474–479 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

A penalty phase jury may consider prior unadjudicated criminal conduct under section 190.3, factor (b). (*People v. Pollock* (2004) 32 Cal.4th 1153, 1196 [13 Cal.Rptr.3d 34, 89 P.3d 353].) The description of mental or emotional disturbance as "extreme" in section 190.3, factor (d), does not preclude the jury from properly considering a defendant's evidence in mitigation, because factor (k) permits the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime." (*People v. Carter* (2005) 36 Cal.4th 1215, 1278–1279, fn. 44 [32 Cal.Rptr.3d 838, 117 P.3d 544]; *People v. Yeoman* (2003) 31 Cal.4th 93, 165 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Jones* (2003) 30 Cal.4th 1084, 1124 [135 Cal.Rptr.2d 370, 70 P.3d 359].) As we have previously said, CALJIC No. 8.85's use of the phrase "whether or not," is not an invitation to jurors who find "a factor not proven" to then "use that factor as a factor favoring imposition of the death penalty." (*People v. Sapp, supra,* 31 Cal.4th 240, 315.)

The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating. (*People v. Jones, supra,* 30 Cal.4th at p. 1129; *People v. Sapp, supra,* 31 Cal.4th at p. 315.) The jury's consideration of prior unadjudicated criminal conduct does not render the penalty judgment unreliable, invalid, or unconstitutional. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1095 [119 Cal.Rptr.2d 859, 46 P.3d 335].) Nor did the court err by not instructing the jury to consider defendant's age—18 at the time of the murders—solely as a mitigating factor, because a defendant's youth may be either mitigating or aggravating. (*Id.* at pp. 1124–1125.)

The trial court need not instruct the jury that imprisonment without possibility of parole means no release or parole ever, or that a sentence of death would result in a defendant's execution. (*People v. Jones, supra,* 30 Cal.4th at p. 1129.)

The federal Constitution does not require that the prosecution prove beyond a reasonable doubt that particular aggravating factors exist (*People v. Kipp, supra,* 26 Cal.4th at p. 1137), that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty (*People v. Crew, supra,* 31 Cal.4th at p. 860). The high court's recent decisions in *Ring v.*

---

*Babbitt* (1988) 45 Cal.3d 660 [248 Cal.Rptr. 69, 755 P.2d 253]. (Use Note to CALJIC No. 8.84.1 (1989 new) (5th ed. 1988).)

*Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], do not compel a different outcome. (*People v. Monterroso, supra,* 34 Cal.4th at p. 796.) The jury need not agree unanimously on the aggravating circumstances. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053.) The jury need not, in light of *Ring* and *Apprendi,* determine the existence or nonexistence of every aggravating factor set out in section 190.3 before it returns a death verdict (*People v. Prieto* (2003) 30 Cal.4th 226, 262–263 [133 Cal.Rptr.2d 18, 66 P.3d 1123]), nor need it prepare written·findings identifying the aggravating factors on which it relied (*People v. Jurado, supra,* 38 Cal.4th at p. 144; *People v. Yeoman, supra,* 31 Cal.4th at p. 165).

### 3. *Appellate review process*

Intercase proportionality review of other murder cases to determine in this case defendant's relative culpability is not required (*People v. Pollock, supra,* 32 Cal.4th at p. 1196); equal protection does not require this court to subject capital convictions to the same sentence review given defendants convicted under the indeterminate sentencing law. (§ 1170, subd. (f); *People v. Cox* (2003) 30 Cal.4th 916, 970 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Lewis* (2001) 26 Cal.4th 334, 395 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

### 4. *International law*

Relying on the practices of other nations, defendant argues that California's imposition of death "as a regular form of punishment for a substantial number of crimes" falls below international norms of humanity and decency. As we recently said in *People v. Perry* (2006) 38 Cal.4th 302, 322 [42 Cal.Rptr.3d 30, 132 P.3d 235], this claim is a mere variant of "the familiar argument that California's death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions." (See *People v. Jones, supra,* 30 Cal.4th at pp. 1127–1128 and *People v. Wader, supra,* 5 Cal.4th at p. 669.)

Citing the right to a fair trial before an impartial tribunal granted by the International Covenant on Civil and Political Rights, defendant complains he was denied that right both by a juror selection process that favored death-biased jurors and by juror concerns over crime in East Palo Alto arising from drug dealing and its associated violence. His contention overlooks the fact that "when the United States ratified the treaty, it specially reserved the right to impose the death penalty on any person, except a pregnant woman, duly convicted under laws permitting the imposition of capital punishment." (*People v. Perry, supra,* 38 Cal.4th at p. 322; see *People v. Brown* (2004) 33 Cal.4th 382, 403–404 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

Defendant, who is not a foreign national, asserts that his trial and sentence are infirm under international law and treaties. Moreover he urges this court to stay his execution to permit him to litigate in an international tribunal. We assume, but do not decide, that defendant has standing to invoke provisions of the international charters and agreements upon which he relies. (See *Sanchez-Llamas v. Oregon* (2006) 548 U.S. ___ [165 L.Ed.2d 557, 126 S.Ct. 2669]; *Breard v. Greene* (1998) 523 U.S. 371, 377 [140 L.Ed.2d 529, 118 S.Ct. 1352].) Defendant's claim, however, lacks merit because international law does not bar imposing a death sentence that was rendered in accord with state and federal constitutional and statutory requirements. (*People v. Elliot, supra,* 37 Cal.4th at p. 488; *People v. Cornwell* (2005) 37 Cal.4th 50, 106 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

Here, defendant has failed to show that his sentence does not meet state and federal constitutional and statutory requirements. There was no infringement of defendant's state or federal constitutional rights because his jury was death-qualified. (*People v. Lenart, supra,* 32 Cal.4th 1107, 1120.) Defendant has not established that he was denied due process, a fair and impartial trial, or was subjected to racial discrimination. The absence of such errors, either individually or collectively, precludes us from reaching his international law claims based on those allegations. (*People v. Cornwell, supra,* 37 Cal.4th at p. 106; *People v. Jones* (2003) 29 Cal.4th 1229, 1269 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

In light of our determination that he has not been deprived of any rights justifying reversal of his conviction, we deny defendant's request for a stay of execution to permit him to seek relief from the Inter-American Commission of Human Rights.

### I. *Cumulative Error*

Defendant argues unpersuasively that his trial was so closely balanced that the cumulative effect of the various errors that he asserts occurred at the penalty and guilt phases of his capital trial require reversal of the judgment. Individually or cumulatively, we find no prejudicial error at either phase of the proceedings.

### V. AUTOMATIC MOTION TO MODIFY

Section 190.4 provides for an automatic motion to modify the jury's death verdict. The trial court rules on the motion after independently reweighing the evidence supporting the aggravating and mitigating factors (§ 190.3) and determining whether in its independent judgment that evidence supports

the death verdict. (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) This court then independently reviews the trial court's ruling in light of the record, "but we do not determine the penalty de novo." (*Ibid.*)

Defendant contends that the trial court did not independently reweigh the evidence in mitigation and aggravation or determine in its own judgment that the evidence presented at trial supported death. He infers that the court could not have done so, because in ruling on the motion the judge, who is required by section 190.4, subdivision (e) to "state on the record the reasons for his findings," did so by reading into the record a typescript some 14 pages in length, which had been prepared by the prosecutor. The judge's use of the prosecutor's language does not support the inference that defendant draws. Before stating his assessment of the evidence, the judge outlined his legal duty to review the evidence and to make an independent determination that it was appropriate to impose the death penalty. Accordingly, we reject defendant's contention that the judge was either unaware of, or did not fulfill, his obligation to conduct a review of the evidence presented at trial and to make an independent determination of the propriety of the jury's verdict of death.

Defendant complains that the trial court erred by relying on an irrelevant fact when it stated that defendant lacked "any good reason" to kill victims Bettencourt, a drug customer, and Morris, who was "friendly and non-threatening." Because the circumstances of the crime (§ 190.3, factor (a)) are an appropriate statutory factor, defendant's claim fails.

In ruling on a motion to modify, " '[t]he trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* [Citations.]' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1161 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

Defendant also argues that by attributing defendant's lack of a prior felony conviction to his young age—18 at the time of the murders—the trial court effectively denied defendant the benefit of both those mitigating factors. (§ 190.3, factors (c) & (i).) Although the court noted that defendant had no prior felony convictions as an adult, it also pointed out that defendant had only been an adult for six months, but in that period defendant had committed three murders. Accordingly, the court found defendant's youth a factor that was "only minimally mitigating." Thus, the court independently reweighed factors (c) and (i), but found they added little to the mitigation side of the scale.

## VI. DISPOSITION

The judgment is affirmed. Defendant's request for a stay of execution is denied.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 25, 2006.