Filed 1/15/16  P. v. Hughes CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GLENN HUGHES,<br><br>        Defendant and Appellant. | A138194<br><br>(Mendocino County<br>Super. Ct. No. SCUKCRCR 12-20031) |

## INTRODUCTION

Defendant Glenn Hughes was convicted of second degree murder and felony assault.  He maintains the court erred in not giving, sua sponte, an instruction on involuntary manslaughter and in refusing his proposed instruction regarding implied malice.  Defendant also claims Penal Code section 29.4,[1] which bars evidence of voluntary intoxication to negate the capacity to form implied malice aforethought, is unconstitutional.  We find no merit in his contentions, and affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

In December 2011, defendant and his girlfriend lived in a trailer at the Hidden Pines Campground outside of Fort Bragg.  They were friends with Jose Madrid and his girlfriend, Shannon Wilson, who were staying in a tent next to defendant's trailer.

On the evening of December 30, the two couples barbecued and drank together at defendant's campground space.  Around 8:00 p.m., defendant and Madrid left to play pool at a bar in Fort Bragg.  Wilson went to sleep inside their tent.  She awoke around

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

11:00 p.m. when Madrid returned.  Wilson asked where defendant was, and Madrid replied he "left that asshole."  Madrid went to sleep beside Wilson.

About 15–20 minutes later, Wilson heard defendant "walking up towards the tent screaming."  She opened the tent and saw defendant, who screamed "where is that motherfucker?  I am going to kill him."  Defendant "ripped open the tent door and he grabbed [Madrid] by his jacket" and dragged his upper torso out of the tent.  Defendant repeatedly yelled:  " 'Why did you leave me?' "

While Madrid was partially outside the tent, defendant, wearing hiking boots, started kicking him in the head.  The first kick "went right square" "in the temple."  Wilson "just knew he was going to kill him by kicking him in the temple, [so she] . . . threw [herself] over [Madrid's] body to try to protect him."  Defendant kicked Madrid "at least eight to ten times."  While defendant continued kicking him, Wilson dialed 911.

Defendant stopped kicking Madrid and walked toward his campsite.  Wilson knew he kept an axe there for splitting wood, and thought he "was going that way to grab that."  Defendant returned and began hitting Madrid with his fists.  When Wilson tried to cover Madrid with her body, defendant grabbed Madrid's head and began kicking Wilson and ripping her hair out.

Mendocino County Sheriff Deputy Clinton Wyant was dispatched to Hidden Pines campground around 1:00 a.m.  He observed a man walking quickly away from an individual on the ground.  Wilson was kneeling on the ground, and was "frantic and hysterical" "saying [Madrid] had been assaulted."  Madrid was on the ground, unresponsive, not breathing and with no pulse.  Although it was "very cold," Madrid was warm and there was "steam coming from his body."  Wyant began performing CPR until EMS arrived.  Medical personnel confirmed Madrid was dead.

Mendocino County Sheriff Deputy Richard Munoz was also dispatched to the campground around 1:00 a.m.  A woman kneeling in front of the tent pointed to defendant, who was walking away, and yelled "that's him."  Munoz detained him and put him in the back seat of a patrol car.  While in the car, defendant was hostile and

threatened the deputies, "telling [them] to take the handcuffs off so he could kick [their] asses."

At 2:30 a.m., defendant was still in the patrol car yelling profanities and challenging the deputies to fight. He had a cut and blood on his hand, but no other injuries.

A blood sample was drawn at 6:00 a.m., which showed his blood-alcohol concentration to be 0.13. A criminalist testified this meant his blood-alcohol level would have been 0.22 at 1:30 a.m.

A man's voice could be heard in the background of Wilson's 911 call recording, saying " 'If you ever leave me like that again, you'll never leave me like that again. Fuck you, motherfucker.' " "Stand your ground, you little fucking bitch." Wilson can be heard saying "Get off him . . . Glenn, get off of him. " Defendant testified he did not know if the man's voice was his. He likewise had no recollection of yelling " 'I'm going to kill him' " as he approached the tent.

Defendant testified he and Madrid drank shots with beer chasers at the bar. At some point, he left the bar without Madrid. He "kind of stumbled out the door and looked and . . . couldn't see [Madrid's] car." He was "pretty drunk." He remembered nothing about the evening after that, including how he got back to the campground. The next thing defendant remembered was "talking to Detective Arrington at the [police] station."

After defendant was transported to the police station, he would only speak with Detective Bryan Arrington, who knew defendant and his family. Arrington questioned defendant at the police station at about 4:30 a.m. At first, defendant stated he did not "even know what [he was] being detained for." Then he stated he "ha[d] nothing to do with nothing" and did not "even know the dude." Then he asked "The dude's not breathing anymore or what . . . . I mean, what am I looking at Bryan?" When Arrington stepped out of the room, defendant stated "Going to prison for the rest of my life. Yeah. I'm going to prison for the rest of my life." Hughes then told Arrington "Look at my shirt. Look at my pants. You know there was [an] altercation." Defendant explained he

3

was just defending himself. "It was self defense all the way, Bryan." He said Madrid and Wilson were fighting, and he told them to stop when "all of a sudden he jumped out and she jumped out." Madrid came out of the tent, "start[ed] jumping on [him,] and "tried to punch [him] in the mouth." Defendant "just defended [himself]." At trial, defendant testified he lied to Arrington when he told him Madrid jumped on him first.

Forensic pathologist Jason Trent performed an autopsy on Madrid. There was evidence of trauma to Madrid's head, including contusions, superficial lacerations, and hemorrhage. Madrid's blood-alcohol concentration was 0.226, and there was morphine in his system. Dr. Trent opined the cause of death was blunt force trauma to the head. He did not believe the amount of alcohol in his blood was enough to cause death, especially because Madrid was a chronic alcoholic. Nor did he believe the amount of morphine would have been fatal. He also opined Madrid was alive when he received the blunt force trauma to the head.

Pathologist Terry Haddix reviewed Dr. Trent's autopsy report, the police reports and photographs taken at the scene. She agreed there were superficial scalp lacerations and swelling. Dr. Haddix testified that under certain circumstances, a blood-alcohol level as high as Madrid's "potentially" could be fatal, but "looking at that level alone . . . probably not." She could not rule out with "100 percent certainty" that Madrid was not already dead when he was pulled from the tent. She would not have "signed off" on blunt force trauma as the cause of death "[b]ecause . . . we are lacking a mechanism, any understanding of exactly how Mr. Madrid died." Thus, Dr. Haddix would not render any opinion on the cause of death based on the information in Dr. Trent's autopsy report. She believed "the cause of death and the mechanism of death are still elusive."

The jury found defendant guilty of second degree murder of Madrid and assault by force likely to produce great bodily injury of Wilson. (§§ 187, subd. (a), 245, subd. (a)(1).) The jury also found true three prior prison term allegations. The court sentenced defendant to a term of 15 years to life for the murder, a consecutive term of the three years for the assault count, and three consecutive one-year terms for the prior convictions.

4

*Failure to Instruct on Involuntary Manslaughter*

Defendant claims the trial court erred in failing, sua sponte, to give an instruction on involuntary manslaughter. We review de novo failure to instruct on a lesser included offense. (*People v. Cook* (2006) 39 Cal.4th 566, 596 (*Cook*).)

When there is substantial evidence showing a defendant committed a lesser-included offense, the trial court has a sua sponte duty to instruct it. (*Cook, supra,* 39 Cal.4th at p. 596.) "The court must, on its own initiative, instruct the jury on lesser included offenses when there is substantial evidence raising a question as to whether all the elements of a charged offense are present [citations] and when there is substantial evidence that defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate the defendant from guilt of the greater offense." (*Ibid.*)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) "The elements of murder are an unlawful killing committed with malice aforethought. (§ 187.) The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. [Citation.] One commits involuntary manslaughter either by committing 'an unlawful act, not amounting to a felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue. [Citation.] Malice is implied, however, when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [Citation.]" (*Cook, supra,* 39 Cal.4th at p. 596.)

Defendant claims "there were substantial grounds for finding that [he] acted without express or implied malice aforethought in his assault on Jose Madrid." He

asserts his statement he was "going to 'kill' " Madrid was hyperbole "rather than an expression of actual intent." He also claims Dr. Haddix's testimony questioning the cause of death undercuts Wilson's testimony "as to the intensity of the attack," thus forming a basis to conclude he was "not acting with a conscious disregard for human life." (Italics omitted.)

The evidence showed Madrid was asleep inside the tent when defendant approached screaming " '[w]here is that motherfucker? I am going to kill him.' " Defendant pulled Madrid out and began kicking him in the head. Wilson testified defendant repeatedly kicked Madrid while she tried to protect him. Defendant testified he knew it was dangerous to kick someone in the head. He also acknowledged lying to Detective Arlington when he told him Madrid jumped on him first.

Dr. Haddix's testimony questioning the exact mechanism of death did not, contrary to defendant's claim, demonstrate an absence of implied malice. Haddix testified Madrid had only superficial injuries, and there was not much bleeding. She was thus "at a complete loss to understand the mechanism whereby these superficial minor injuries of the skin ultimately resulted in death," and testified death was not an expected outcome of the types of injuries observed on Madrid's body.

The standard for assessing implied malice, however, is not whether death was an expected outcome of Madrid's observable injuries, but whether the natural and probable consequences of repeatedly kicking someone in the head are dangerous to human life. (*Cook, supra,* 39 Cal.4th at p. 596.) Dr. Haddix acknowledged it was "dangerous to kick somebody in the head," and defendant himself testified he knew it was dangerous to kick someone in the head. Regardless of whether a physician could point to the precise mechanism of death, there was no dispute the natural and probable consequences of repeatedly kicking someone in the head are dangerous to human life, and defendant knew that.

Defendant also asserts his statement " 'I'm going to kill him' " was merely hyperbole. There was no evidence it was hyperbole: at trial, defendant was questioned about the statement and testified he did not recall making it. Even if the statement was

6

merely hyperbole and did not demonstrate intent to kill, it demonstrated intent to attack Madrid and deliberate action in conscious disregard of Madrid's life, and was further evidence of implied malice.[2]

Defendant also asserts an involuntary manslaughter instruction was required by Justice Kennard's concurring opinion in *People v. Bryant* (2013) 56 Cal.4th 959. In that case, the majority addressed only whether a "killing without malice in the commission of an inherently dangerous assaultive felony" was voluntary manslaughter. Concluding it was not, it reversed the Court of Appeal's judgment that had reversed the defendant's murder conviction. (*Id.* at pp. 970–971.) The court declined to address defendant's "alternative contention that because assault with a deadly weapon is not an inherently dangerous felony, the trial court erred in failing to instruct the jury on the theory of involuntary manslaughter." (*Id.* at p. 971.) Justice Kennard, however, addressed the claim, noting assault with a deadly weapon is a "wobbler," and concluding that "if assault with a deadly weapon is regarded as a misdemeanor, it necessarily qualifies as 'an unlawful act, not amounting to a felony' . . . in which case a killing that occurs in the commission of such an offense is involuntary manslaughter . . . ." (*Id.* at p. 972, fn. 2 (conc. opn. of Kennard, J.).)

Defendant contends his act of assaulting Medina could possibly be a wobbler, requiring the court to instruct the jury on involuntary manslaughter. We disagree. In *Bryant,* there was no dispute the killing was without malice. (*People v. Bryant, supra*, 56 Cal.4th at p. 963.) The issue was solely whether a killing *without malice* in the commission of an inherently dangerous assaultive felony is *voluntary* manslaughter. (*Id.*

---

[2] Defendant claims three cases cited by the Attorney General, including *Cook*, in which the court held the trial court had no sua sponte duty to instruct on involuntary manslaughter, actually support his position because "the degree of injury shown . . . was much more serious than the injuries shown in the instant case." This is essentially a recycled version of his argument based on Dr. Haddix's testimony. As we have discussed, the fact his retained expert was unable to reach a conclusion as to the exact "cause of death and the mechanism of death" based on the observable trauma to the body, does not mean the degree of ultimate injury to Madrid—death—was any less significant than in *Cook* and the other cases.

7

at p. 963.) Justice Kennard's concurring opinion was not the opinion of the court and was "distinct from the question on which we granted review." (*Id.* at p. 971.) Notably, even though Justice Kennard opined that assault with a deadly weapon "constitute[d] an unlawful act that ma[de] a killing occurring during the assault involuntary manslaughter," she also concluded the "trial court, however, had no duty to give such an instruction on its own initiative . . . ." This is because "a trial court has no duty to instruct on a legal principle that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principle of law." (*Id.* at pp. 971, 975, italics omitted.)[3]

In sum, even if the issue of express malice was debatable, the issue of implied malice was not. And "[b]ecause the evidence presented at trial did not raise a material issue as to whether defendant acted without malice, the trial court was not obliged, on its own initiative, to instruct the jury on involuntary manslaughter . . . ." (*Cook*, *supra*, 39 Cal.4th at pp. 596–597.)

### *Defendant's Proposed Modification of the Implied Malice Instruction*

Defendant also maintains the trial court erred in refusing his proposed modification to CALCRIM No. 520, the implied malice instruction. He sought to add the additional sentence "An act is dangerous to human life if the natural and probable consequences of the act involve a high degree of probability that it will result in death."

Defendant based his proposed modification on language in *People v. Thomas* (1953) 41 Cal.2d 470. As the court in *People v. Knoller* (2007) 41 Cal.4th 139 (*Knoller*)

---

[3] Defendant asserts "this principle is inapplicable here," even though "Justice Kennard's own analysis appears for the first time after trial in the instant case." He claims Justice Kennard's concurring opinion "shows, it is a short step to the conclusion that 'not amounting to a felony' is also not a definitional element." Assuming it is a short step, it is not one the trial court was required to make. Defendant's claim that even if the trial court had no sua sponte duty to instruct, his due process rights were violated because the jury did not resolve every issue of material fact, also fails. He has provided no basis on which to expand the due process requirement that a "jury resolve every issue of material fact" to include instances "when the materiality of a fact presented by the evidence has been obscured through legal or judicial confusion."

8

explained: " 'Two lines of decisions developed, reflecting judicial attempts "to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." ' [Citations.]  Under both lines of decisions, implied malice requires a defendant's awareness of the risk of death to another.  [¶] The earlier of these two lines of decisions [citation], originated in Justice Traynor's concurring opinion in *People v. Thomas*[, *supra*,] 41 Cal.2d 470, 480 . . . , which stated that malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.'  (We here refer to this as the *Thomas* test.)  The later line dates from this court's 1966 decision in *People v. Phillips* [(1966), 64 Cal.2d 574, 587**4**]:  Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." '  (The *Phillips* test.) [¶] In *People v. Watson* (1981) 30 Cal.3d 290, 300 . . . , we held that these two definitions of implied malice in essence articulated the same standard."  (*Knoller, supra,* 41 Cal.4th at p. 152.)

The *Knoller* court, however, endorsed use of the *Phillips*-based instruction. "Concerned, however, that juries might have difficulty understanding the *Thomas* test's concept of 'wanton disregard for human life,' we later emphasized that the 'better practice in the future is to charge juries solely in the straightforward language of the "conscious disregard for human life" definition of implied malice,' the definition articulated in the *Phillips* test.  (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 . . . .) The standard jury instructions thereafter did so.  (See CALJIC No. 8.11; [CALCRIM] No. 520.)  Since 1989, our decisions have articulated the standard we set out in *Dellinger* and in CALJIC No. 8.11."  (*Knoller, supra,* 41 Cal.4th at p. 152.)

Defendant claims the trial court had discretion to instruct with the *Thomas*-based definition of implied malice and asserts the instruction given "distorted an essential

---

**4** Overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, footnote 12.

9

element of implied malice aforethought." The question, however, is whether the trial court abused its discretion by instructing the jury with the definition of implied malice endorsed by the Supreme Court in *Knoller*. We cannot conclude instructing the jury on implied malice with the definition recently endorsed by *Knoller* is an abuse of discretion.[5]

### *Constitutionality of Section 29.4*

Defendant next asserts section 29.4 violates his due process rights because it precluded him from introducing evidence of voluntary intoxication to negate the mental state required for implied malice, relying on *Montana v. Egelhoff* (1996) 518 U.S. 37 (*Egelhoff*).

Section 29.4[6] provides in part: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subds. (a)–(b).)

A "defendant who unlawfully kills without express malice due to voluntary intoxication can still act with implied malice, which voluntary intoxication cannot negate." (*People v. Carlson* (2012) 200 Cal.App.4th 695, 707.) Accordingly, "[t]o the extent that a defendant who is voluntarily intoxicated unlawfully kills with implied malice, the defendant would be guilty of second degree murder." (*Ibid*.)

In *Egelhoff*, the United States Supreme Court considered a due process challenge to a Montana statute similar to section 29.4, which provided in part that voluntary intoxication " 'may not be taken into consideration in determining the existence of a

---

[5] Nor can we conclude, contrary to defendant's assertion, that the refusal to use his preferred language violated his due process rights.

[6] Section 29.4 was formerly section 22.

10

mental state which is an element of [a criminal] offense.' " (*Egelhoff*, *supra*, 518 U.S. at pp. 39–40.) Three justices joined in Justice Scalia's plurality opinion, holding "[t]he people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so . . . ." (*Id*. at p. 56.)

Defendant maintains, however, that Justice Ginsburg's concurring opinion in *Egelhoff* both "represents the holding" of the court[7] and demonstrates section 29.4 is violative of due process. Justice Ginsburg explained the critical question was characterization of the statute as either a "rule designed to keep out 'relevant, exculpatory evidence,' " or "a redefinition of the mental-state element of the offense." (*Egelhoff*, *supra*, 518 U.S. at pp. 56–57 (conc. opn. of Ginsburg, J.).) Characterizing the statute as removing a category of evidence from the jury's consideration, as the four dissenting justices did, raised due process concerns. (*Id*. at p. 61.) Because Justice Ginsberg "resist[ed] categorizing [the statute] as merely an evidentiary prescription, [she] . . . join[ed] the Court's judgment refusing to condemn the Montana statute as an unconstitutional enactment." (*Id*. at pp. 56–57.)

Defendant maintains section 29.4 is an "evidentiary limitation" and therefore violates his due process rights. The California Supreme Court rejected that claim, although without much analysis: "we reject defendant's argument that the withholding of voluntary intoxication evidence to negate the mental state of arson violates his due process rights by denying him the opportunity to prove he did not possess the required mental state." (*People v. Atkins* (2001) 25 Cal.4th 76, 93, citing *Egelhoff*, *supra*, 518 U.S. at pp. 39–40.)

Our colleagues in Division Four addressed the issue extensively in *People v. Timms* (2007) 151 Cal.App.4th 1292 (*Timms*). The court first considered the assertion

---

**7** "When a fragmented Court decides a case and no single rationale for the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds. . . .' " (*Marks v. United States* (1977) 430 U.S. 188, 193 (*Marks*).)

11

that Justice Ginsburg's concurring opinion represented the holding of *Egelhoff*. "Justice Scalia, with the concurrence of three justices, found no due process violation because the right to have a jury consider evidence of voluntary intoxication is not a ' "fundamental principle of justice." ' ([*Egelhoff*, *supra*, 518 U.S.] at pp. 43–48 (plur.opn.).) Another four justices concluded the statute did violate the defendants' due process rights because it disallowed evidence relevant to determining the existence of a mental state that is an essential element of the crime. (*Id*. at p. 61 (dis. opn. of O'Connor, J.).) Concurring in the judgment, Justice Ginsburg drew a distinction between rules designed to keep out relevant, exculpatory evidence that might negate an essential element, and rules that redefine the mental state element of the offense. The former would be violative of due process while the latter would not. She viewed the Montana statute as amounting to a redefinition of the offense that rendered evidence of voluntary intoxication irrelevant to proof of the requisite mental state. (*Id*. at pp. 57–59 (conc. opn. of Ginsburg, J.).)" (*Timms*, *supra*, 151 Cal.App.4th at p. 1299.)

*Timms* "assumed" Justice Ginsburg's opinion was the holding of *Egelhoff*, and held "the application of section 22 does not violate appellant's due process rights." (*Timms*, *supra*, 151 Cal.App.4th at p. 1300.) It explained: "Appellant characterizes the amended section 22 as belonging to the prohibited category of evidentiary rules designed to exclude relevant exculpatory evidence, but it is not. First, we note that Justice Ginsburg also stated: 'Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend a "fundamental principle of justice," given the lengthy common-law tradition, and the adherence of a significant minority of the States to that position today. [Citations.]' (*Egelhoff*, *supra*, 518 U.S. at pp. 58–59 (conc. opn. of Ginsburg, J.).) Under this rationale, the 1995 amendment permissibly could preclude consideration of voluntary intoxication to negate implied malice and the notion of conscious disregard. Like the Montana statute, the California Legislature could also exclude evidence of voluntary intoxication in determination of the requisite mental state. [¶] Second, as we have shown, section 22 is part of California's history of limiting the exculpatory effect of voluntary intoxication and other capacity evidence. [Citations.]

12

Section 22 does not appear in the Evidence Code, it appears in the Penal Code under the 'Preliminary Provisions,' along with statutes defining and setting forth the kinds and degrees of crimes and their punishment (§§ 16–19.8), the requirement of act and intent or negligence (§ 20), the elements of attempt (§ 21a), etc.  Since 1872, the first sentence of section 22 (now at subdivision (a)) has declared the policy of this state that an act is not less criminal because the actor committed it while voluntarily intoxicated.  This means that, with respect to the same conduct, an intoxicated person shoulders the same criminal responsibility as a sober person.  The next sentence declares the substantive law that voluntary intoxication is not available to a defendant as a basis for a diminished capacity defense.  Subdivision (b) establishes, and limits, the exculpatory effect of voluntary intoxication on the required mental state for a particular crime.  It permits evidence of voluntary intoxication for limited exculpatory purposes on the issue of specific intent or, in murder cases, deliberation, premeditation and express malice aforethought.  The absence of implied malice from the exceptions listed in subdivision (b) is itself a policy statement that murder under an implied malice theory comes within the general rule of subdivision (a) such that voluntary intoxication can serve no defensive purpose.  In other words, section 22, subdivision (b) is not 'merely an evidentiary prescription'; rather, it 'embodies a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions.'  (*Egelhoff, supra*, 518 U.S. at p. 57 (conc. opn. of Ginsburg, J.).)  In short, voluntary intoxication is irrelevant to proof of the mental state of implied malice or conscious disregard.  Therefore, it does not lessen the prosecution's burden of proof or prevent a defendant from presenting all relevant defensive evidence."  (*Timms, supra*, 151 Cal.App.4th at pp. 1300–1301.)

We agree with the well-reasoned opinion in *Timms*.  Defendant has failed to demonstrate Penal Code section 29.4 violates his due process rights.

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.